ILLINOIS POWER COMPANY, Plaintiff-Appellee, *v.* CHAMPAIGN ASPHALT CO., Defendant-Appellant.

(No. 12208;

Fourth District—April 25, 1974.

Busch, Harrington & Porter, of Champaign, for appellant.

Hatch, Corazza, Baker & Jensen, of Champaign (Harold A. Baker, of counsel), for appellee.

Mr. JUSTICE SIMKINS deivered the opinion of the court:

This is an appeal from a judgment for $7923.47 in favor of the plaintiff power company for electricity supplied to the defendant over a 3-year period in excess of the amount billed and paid for as measured and recorded by plaintiff's defective transformer and metering equipment.

The plaintiff, Illinois Power Company, entered into a contract in July 1959 to supply defendant, Champaign Asphalt Company, with electricity. On October 27, 1969, the plaintiff filed a complaint alleging that from

April 1964 to May 1967 the plaintiff supplied electricity and the defendant paid for the amount billed as registered by the plaintiff's meter. The complaint further alleged that a routine review of accounts by the plaintiff indicated a likely error in the defendant's account in that there was a sudden decrease of approximately 50% in the amount billed to the defendant in April 1964, continuing up to the time of the review, and that on May 25, 26 and 27, 1967, tests were performed which indicated that the meter at the defendant's premises was recording only 50% of the current actually being used. The complaint therefore concluded that from April 1964 to May 1967 the defendant had only been billed for one-half of the electricity used and that the defendant would owe $7923.47 for the used, but unpaid-for, electricity.

The defendant filed a motion to dismiss on the grounds that plaintiff's complaint failed to state a cause of action because it did not state that the plaintiff had complied with general order 161 of the Illinois Commerce Commission nor affirmatively state the steps taken to comply with that general order. It further alleged that on its face it was clear that the basis of the claim arose more than 1 year after such electricity was furnished, and, since under section 76 of the Public Utilities Act (Ill. Rev. Stat., ch. 111⅔, par. 76), the defendant could not contest any rate charge after 1 year, equal protection would require the plaintiff's right also to be barred. After its motion to dismiss was denied, defendant filed an answer to the complaint admitting the relationship between the parties and the using and paying for electricity billed between April 1964 and May 1967, but denied that electricity had been used in addition to that billed and paid for. The defendant denied that plaintiff had performed all the terms of the contract and alleged that plaintiff had failed to test the meter as required in Rules 12 and 13 of General Order 161 of the Illinois Commerce Commission. The answer contended that the plaintiff would be barred by Rule 16(c) of the General Order because it allowed the inaccurate meter to remain in service and relied upon it for 3 years, sending bills each month which were promptly paid, and finally, asserted that the provision of Rule 16(b) that where a non-registering meter has been read while not working the utility is limited to billing only for the estimated consumption not to exceed twice the period of the regular interval between readings would preclude plaintiff from recovering for more than that period, if any recovery at all were proper.

A bench trial was held on August 4, 1970, at which the plaintiff produced testimony concerning the review of accounts in May 1967 which disclosed that the defendant's usage of electricity had dropped by approximately one-half in April 1964 and introduced records of the monthly meter readings and bills of the defendant's account from 1959 through

1967 showing the drop in usage during the time in question as compared to the corresponding months in years prior to 1964. An instrumentation engineer employed by the plaintiff described the metering devices used at the defendant's premises and testified to the periodic tests, some of which were performed annually, and further testified to tests made on all the metering devices before installation. It was brought out that a large commercial or industrial user like the defendant does not utilize a simple watt hour meter as commonly used in private homes, but rather a demand type meter is used because it is impractical to have a meter large enough to actually measure all the electricity passing through it. The demand type meter diverts a particular constant proportion of the total current and measures it, thus requiring two steps, the transformer which separates the relatively small proportion of the total current, and the regular watt hour meter which measures and records it. Plaintiff's witnesses testified that the watt hour meter was tested annually and was apparently functioning correctly in past years and at the time of the test in May 1967. However, those more extensive tests made after the discovery of a probable under reading showed that the instrument transformer was malfunctioning. A parallel installation test showed a constant load pattern which would indicate the transformer was damaged, and upon further inspection the tank and transformer portion of the metering device appeared to have been damaged, in the opinion of the engineer, by lightning. The engineer further testified that the watt hour meter would not work without the instrument transformer, but that there could be a partial failure which would result in an under-registration by the watt hour meter. It was brought out that the watt hour meter was tested annually, but the instrument transformer had not been tested since its installation because, although there were tests that could be performed, they would only be accurate at high load and the plaintiff power company did not make tests during times of defendant's high usage because it was considered to be dangerous due to the location of the metering equipment.

The defendant's evidence consisted of testimony from the manager of another power company who testified it was their practice to review the accounts of large commercial users three or four times a year. The defendant also produced testimony to the effect that there are three lights on demand transformers which would indicate a malfunction by one or more of them not being lighted. In addition the defendant elicited testimony to the effect that it was possible to test the instrument transformer as well as the watt hour meter periodically while installed and in operation.

On January 26, 1971, the court filed an order which summarized the evidence indicating that the fact of the under-registration to the extent of 50% during the 37-month period was established, but "The court finds from all the evidence introduced and from all the facts and circumstances in this case that the plaintiff utility was at fault in not making a more thorough test of the meter, transformer, and all of the measuring equipment between the period of May 1964 and May 1967, and that it was further at fault and negligent in not reviewing the customer accounts and determining that it was metering inaccurately the use of electricity subsequent to April 1964 prior to doing so in May 1967." However, language in the next paragraph where the court found that large accounts should be reviewed more often than once in 3 years, there being evidence in the record that another company reviews their large accounts as often as three or four times a year, indicates that the primary reason for finding the plaintiff "at fault" was the lack of diligence in reviewing accounts and the fact that the plaintiff relied on its defective meter readings for 37 months, rather than a failure to comply with the technical testing requirements. In entering judgment for the defendant the court said "Accordingly, from such findings and from all the evidence in the case, the court finds that the plaintiff is at fault and is not free from negligence and should not be allowed to recover."

The plaintiff filed a post trial motion alleging that the court erred in finding the plaintiff "at fault" under General Order 161 by failing to conduct "more thorough tests" and in not conducting more frequent review of customer accounts. Plaintiff contended that the court's interpretation of General Order No. 161 was in conflict with section 37 of the Public Utilities Act prohibiting public utilities from discriminating in rates by any means, and also sections 53, 54, and 55 of the Public Utilities Act, which authorize the Commerce Commission to formulate rules such as General Order No. 161. Plaintiff further contended that the court was in error in injecting principles of common law into an action arising under contract and by going outside the bounds of General Order No. 161 and the Public Utilities Act to define "at fault". After hearing arguments on the post trial motion, the trial court vacated the prior judgment in favor of the defendant and entered judgment in the amount of $7923.47 plus costs in favor of the plaintiff. In a memorandum opinion the trial court said that it had reviewed the evidence and found that because of a defect in the transformer installed at the defendant's place of business by the plaintiff, the defendant was charged for and paid for one-half the electricity actually used between April 1964 and May 1967. However, the court now found that the tests were made by the plaintiff as provided in

General Order No. 161 and that the court had erred previously in extending the substantive provisions of section 54 of the Illinois Public Utilities Act and the provisions of Rule No. 161.

Finally the court extensively analyzed sections 37, 38, and 39 of the Public Utilities Act, concluding that they require a utility to collect the full amount established in their schedules and dictate that a utility may not, even by its own negligence, discriminate in rates between users.

The finding by the trial court, amplified in its second order, as to the existence of the meter defect, the 50% under-registration, and the period for which under-billing and under-payment resulted is only peripherally raised on appeal. The primary issue is whether or not the plaintiff was negligent or at fault, and if so, whether it should preclude recovery; or more specifically, the meaning of the term "not being at fault" in Rule 16(c) of General Order No. 161, and whether sections 37, 38, and 39 of the Public Utilities Act would require recovery regardless of the utility's conduct. In addition, defendant argues that its equal protection of law would be violated by allowing plaintiff to recover for electricity consumed more than one year earlier while section 76 of the Public Utilities Act would limit the consumer who wished to contest the rate charged to that length of time.

Referring to Rule 16 of General Order No. 161 of the Illinois Commerce Commission, (a) provides that when by tests a watt hour meter is determined to have an average error of more than 4%, an adjustment of the consumers' accounts shall be made in the case of an over-registration, and may be made for under-registration. The provision of Rule 16 of particular interest in this case is (c) pertaining to under-registration, which provides: "All such charges for under-registration shall be conditional upon the utility not being at fault for allowing the inaccurate meter to remain in service. The utility shall in no case render a bill for under-registration where the requirements of Rules 9(c), 12, 13 and 14 have not been complied with." Rule 9 referred to above pertains to customer meter test loads, and the other rules provide extensive technical standards for initial tests, periodic tests, meter accuracy requirements, complete with procedures to be followed and permissible tolerances. The basic issue then is the scope of the term "at fault". Plaintiff argues that since the other rules in General Order No. 161 are specific and clear, fault must be limited to the testing of the meters, and since plaintiff did test the complete meter system before installation and the watt hour meter periodically thereafter, the rule is satisfied. Defendant argues that the words "at fault" are much broader than that, and where the meter was exclusively in the control of the plaintiff and relied upon by the plaintiff

for such an extended period of time, when such error could have been discovered by reviewing the account or by more thorough testing of all the equipment, that plaintiff was "at fault" and buttresses that argument by the provision in Rule 16(c) that in case a meter does not register at all and is read while so inoperative, the utility cannot recover more than the estimated usage for twice the regular period of the reading.

The court's first order, in favor of the defendant, made the general finding that the plaintiff utility was at fault in not making a more thorough test of the meter, transformer, and all the measuring equipment during the period in question, but seemed to base the finding of fault primarily on the conclusion that the plaintiff was negligent in not reviewing the accounts more often and relying on billing and collecting payment for the erroneous amount for an extended period of time rather than a technical engineering shortcoming. The second order, in favor of the plaintiff, here appealed from, in its finding of fact stated that a defective transformer caused the erroneous meter readings and at a later point held that the plaintiff had satisfied the requirements of General Order No. 161 as to testing of the meters. Those findings are not inconsistent with the plaintiff's theory that the meters which are required to be tested by the rules were tested and were accurate, but that the transformer, which was not required to be tested periodically while in use, caused the defective reading by diverting only one-half of the proper portion of the flow to the meters to be measured.

■■ The argument by the defendant that the utility should not recover where under-billing was the result of defective equipment exclusively under the utility's control which was allowed to remain in operation over 3 years, compounded by the failure of the plaintiff to discover the mistake by reviewing the accounts, is quite appealing and rational, but requires extending the term "at fault" to include general negligence in failing to discover the malfunction rather than the technical testing requirements set forth in General Order No. 161. Section 54 of the Public Utilities Act entitled Standards of Service—Examinations and Tests, provides that:

> "The Commission shall have power to ascertain, determine and fix for each kind of public utility suitable and convenient standard commercial units of service, product or commodity, * * * to ascertain, determine and fix adequate and serviceable standards for the measurements of quantity, quality, pressure, initial voltage, * * * and to prescribe reasonable regulations for examining, measuring and testing such service, product or commodity, and to establish reasonable rules, regulations, specifications and stan-

dards to secure the accuracy of all meters and appliances for examining, measuring or testing such service, product or commodity." (Ill. Rev. Stat. 1971, ch. 111⅔, par. 54)

The thrust of the language authorizing the Commerce Commission to formulate its General Order No. 161 is technical, and in this context the term "at fault" in Rule 16(c) would seem to be confined to a failure to properly perform the required tests or to keep the meters within the required tolerances. It is true that the instrument transformer, which apparently caused the erroneous readings here, was a part of the metering equipment, owned, installed, and relied upon by the plaintiff, but whether because transformers seldom only partially fail, or no reliable tests are practical, or testing is hazardous, the rules do not require periodic tests of the transformer as frequently as the volt meters which the court found plaintiff had tested as required.

Perhaps being justifiably confused by the technical language of the rules on testing and the expert testimony adduced on that subject, the trial court in both orders very briefly addressed itself to compliance with those requirements (in the first order saying generally it found plaintiff at fault in not making a more thorough test of the meters, and in the second order finding plaintiff did comply with General Order No. 161) and in both orders emphasized other reasons for the results (in the first order finding the plaintiff generally negligent in failing to review the accounts more often and relying on the defective meter for so long, and in the second order finding sections 37, 38, and 39 of the Utilities Act require the utilities to recover in order to avoid rate discrimination). However, we believe the defendant's reliance on Rule 16(c) is misplaced. It is true that it refers to recovery being conditioned upon the utility not being at fault for allowing the inaccurate meter to remain in service, and the sentence immediately following that provision to the effect that in no case shall a utility recover if it fails to comply with certain other rules of the general order could be construed to mean that "at fault" includes a more general negligence for failure to use due care in maintaining its meters and in discovering error by whatever means, including reviewing accounts regularly. However, the remainder of Rule 16 refers to inaccurate meters, and the other rules of General Order No. 161 provide technical standards for the installation and periodic testing of meters nowhere requiring accounts to be reviewed or other standards to insure correct billing. In light of the statutory authorization of paragraph 54 specifically referring to establishing rules and regulations to secure the accuracy of meters and for examining, measuring or testing such service, it seems that "at fault" in Rule 16(c) must be limited to

the scope of General Order No. 161 on the testing and tolerances for meters.

The defendant offers three reasons why the plaintiff's recovery should be limited in the event that any recovery at all is proper. First, Rule 16(c) provides that in the event of under-registration "* * * It shall, unless the contrary can be shown, be assumed that such under-registration has not existed for more than 6 months prior to the date of its discovery." In the instant case the 6-month presumption was rebutted plaintiff having shown a sharp decline beginning in April 1964 and continuing thereafter. Rule 16(c) also provides that in case of a non-registering meter which has been read during the period of non-registration the bill shall be for an estimated use of no more than twice the regular interval between readings, and the defendant contends that the recovery should be limited to 2 months in this case. Clearly if the meter is completely inoperative the utility would have knowledge upon the second reading if not the first, so this absolute time limit is quite rational. However, in the instant case the meter did register significant quantities of electricity which were billed and paid for throughout the period—the meter never being "non-registering".

Finally, defendant contends that because section 76 of the Public Utilities Act would limit the consumer to 1 year from the time of the furnishing of electricity by a utility to contest the rate charge, equal protection requires that plaintiff be limited to a like period. (Ill. Rev. Stat. 1971, ch. 111⅔, par. 76.) However, section 76 refers to *rate* charges which are distinguishable from erroneous *volume measures*, although of course one way to discriminate in rate would be to purposely use a meter not correctly calibrated or to agree to charge only for certain volume. Section 76, which provides the consumer with a special procedure before the Commerce Commission rather than the courts, is concerned with rate discrimination or excessiveness rather than a situation where there is an error in measuring the quantity of the commodity or service, or in billing for the same. If the utility was here seeking to recover payment for 37 months during which it had erroneously charged defendant the wrong rate, defendant's equal protection argument would be well taken, but the basis of this action is the mistake as to quantity or volume supplied and used.

As noted before, the trial court's order in favor of the plaintiff here appealed from, while finding that the plaintiff had performed the test required by General Order No. 161 and that the court erred in its previous order by extending fault which would preclude recovery to a failure to review accounts more frequently and to conduct more thorough tests,

primarily relied upon and extensively analyzed section 37 of the Public Utilities Act (No public utility shall receive less or different compensation for any product or service rendered than the rates applicable as specified in its schedule in effect at that time); section 38 (No public utility shall make or grant any preference or advantage to any consumer with respect to rates or other charges); and section 39 (No public utility shall directly or indirectly by any means whatsoever suffer or permit any user to obtain any service commodity or product at less than the rate established by the schedules filed and in effect at the time). The trial court analyzed a number of cases—primarily involving railroads in Illinois, but gas and electric utilities in other jurisdictions—where it has been held that the utilities have a duty and a right to recover for all of the goods or services furnished, no matter whether incorrect bills were submitted for any reason, and that they are not estopped by even their own negligence from collecting the entire amount due under their tariff. Since the instant case does not involve negligent under-billing nor intentional rate discrimination, and we have concluded that there are other grounds for affirming the judgment below, we need not decide the precise relationship between the above statutory provisions and General Order No. 161, Rule 16. However, we are not persuaded that the provisions prohibiting rate discrimination by any means would always require the public utility to recover regardless of their conduct, nor that the conditions to recovery in Rule 16(c) would never preclude recovery.

■■■ In the instant case the trial court found that the under-registration was caused by a defective transformer, but that the plaintiff had performed tests required by General Order No. 161. As to proof of the deficiency and the period of time, the results of the tests in May 1967 indicating that the meter was only registering 50% of the electricity flow, corroborated by the sudden drop of approximately the same proportion in April 1964, is adequate to establish both the amount of error and its duration. Damages may be established on the basis of reasonable probability. (*Schatz v. Abbott Laboratories, Inc.*, 51 Ill.2d 143, 281 N.E.2d 323.) If the amount the monthly bill decreased was so obvious as to constitute negligence on the part of the plaintiff as the defendant argues, it must also have put the defendant on notice that it was using much more electricity than it was being billed for. In addition the defendant presented no evidence that its methods or level of operations changed as would be consistent with the amount recorded dropping by 50%.

Affirmed.

SMITH, P. J., and KUNCE, J., concur.