CITIZENS UTILITIES COMPANY OF ILLINOIS, Appellant, v. THE ILLINOIS COMMERCE COMMISSION, Appellee (The Village of Bolingbrook, Intervenor-Appellee).

Third District   No. 3—86—0441

Opinion filed March 9, 1987.

Stephen J. Mattson, Lee N. Abrams, and John E. Muench, all of Mayer, Brown & Platt, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Hercules F. Bolos and Kathleen Nolan, Special Assistant Attorneys General, and Edward P. O'Brien, Assistant Attorney General, of Chicago, of counsel), for appellee Illinois Commerce Commission.

George A. Marchetti, of Moss & Bloomberg, Ltd., of Bolingbrook, for appellee Village of Bolingbrook.

JUSTICE HEIPLE delivered the opinion of the court:

Citizens Utilities Company of Illinois (Citizens) appeals from a decision of the circuit court of Will County affirming two orders of the Illinois Commerce Commission (Commission). The Commission orders appealed from reduced Citizens' rate base, altered the manner in which one of Citizens' utility plants was treated for tax purposes, and denied Citizens any working capital allowance. We reverse and remand for further proceedings.

A certain amount of background information is necessary to understand the Commission's orders and our ruling in this case. As apparently is common in the water and sewer utility industry, Citizens acquired a plant which was financed and built by the developer of a subdivision. The developer deeded the plant to Citizens under a contract which obligates Citizens to make payments to the developer based on the revenues the utility company receives from its customers in the subdivision. A utility plant taken over from a developer in the manner described is known as a plant acquired by contract (contract plant).

Operating utility plants which provide service to customers are usually included in a utility's rate base and the formula used to determine the rates a utility may charge its customers. The depreciation

expense associated with plants in service is usually an allowable expense for ratemaking purposes. Contract plants are treated differently, however, because they are funded by developers rather than the utility. Therefore, contract plants are not included in a utility's rate base, and depreciation expenses associated with the contract plants are not allowable expenses for ratemaking purposes.

Depreciation of contract plants is treated differently for Federal income tax purposes than it is for ratemaking purposes. Each year, Citizens Utilities Company (CUC), Citizens' parent company, files a consolidated Federal income tax return for itself and its subsidiaries, including Citizens. In calculating its taxes, CUC is allowed by Federal law to deduct depreciation expenses on all of its tangible property, including any contract plants, and thereby reduce the group's taxable income and the resulting tax expenses.

Under established principles of law, a public utility is entitled to the opportunity to earn a fair return on the property it uses to serve the public. In addition to a fair rate of return, a utility company is entitled to recoup allowable expenses through the rates it charges. Income tax expenses for utility plants, including contract plants, are in the category of allowable expenses.

With the above necessary background information, the relevant facts in this case are as follows. Citizens is a public utility which provides water and sewer service to approximately 22,000 customers in several service areas in northern Illinois. From 1958 through 1982, the Commission allowed Citizens to recover in its rates income tax expenses which were calculated as though no depreciation were claimed on the contract plant. These income tax expenses were allowed, because as previously noted, depreciation of a contract plant is not allowed for ratemaking purposes. In reality, however, CUC, Citizens' parent, was allowed to depreciate the contract plant for Federal tax purposes from 1958 through 1982 and thereby reduce its level of income taxes. Therefore, some of the income tax expenses which were charged to the ratepayers and recovered by Citizens in its rates were not in fact paid to the Federal government by CUC.

In March 1984, Citizens filed an application with the Commission seeking, *inter alia*, approval of the manner in which Citizens treats the Federal tax benefits associated with its contract plant. The Commission entered its order in this case on January 30, 1985. According to the Commission's calculations, between 1958 and 1982, Citizens' recovered $4.2 million more for tax expenses related to the contract plant than was ever owed or paid to the Federal government. The Commission determined that the $4.2 million in tax benefits was actu-

ally a form of cost-free capital provided by Citizens' customers. Based on this determination, the Commission ordered that the rate base used to establish Citizens' future rates be reduced by $4.2 million to prevent Citizens from earning a return on capital which was not supplied by its investors. Additionally, the Commission reduced the income tax expense allowed to Citizens in the 1983 test year by $403,432, the amount of the reduction in CUC's consolidated income tax liability which was attributable to depreciation deductions on the contract plant. Citizens' petition for rehearing was denied and Citizens appealed to the circuit court of Will County.

On April 19, 1984, Citizens filed its proposed rate schedules with the Commission. Several intervenors, including appellee village of Bolingbrook, were permitted to take part in the proceedings. During the hearings conducted by the Commission, Citizens presented evidence that, based on a formulaic calculation, it was entitled to a working capital allowance of over $600,000. Although a utility's working capital allowance can also be determined from the results of a lead-lag study, the Commission staff witness testified that he, too, used the formula method in determining Citizens' working capital needs because that was a reasonable approach to use. In fact, the staff witness used Citizens' formula to calculate the $586,724 working capital allowance he recommended to the Commission for inclusion in Citizens' rate base.

The Commission ruled on Citizens' proposed rates on March 13, 1985. The Commission denied Citizens a working capital allowance on grounds that use of the formula method for the determination of a working capital requirement was unacceptable for Citizens. The order entered by the Commission further indicated that because Citizens is a large utility, it should bear the expense of conducting a lead-lag study to demonstrate an actual need for working capital. Because the record did not contain evidence of any actual need, the Commission refused to allow any working capital allowance.

Citizens appealed from the Commission's order in the rate case. The circuit court of Will County consolidated the appeals from the tax case and the rate case, then affirmed the Commission's orders without opinion. Because the Commission reached improper results in both cases, we reverse and remand.

■ We acknowledge that the orders of the Commission are generally entitled to great weight and deference. However, as the appellant has pointed out, where the facts in a case are not in dispute and the issue is one of law, this court is not bound by the determinations of the Commission, nor are those determinations entitled to a presump-

tion of *prima facie* correctness. (*Western Illinois Electrical Cooperative v. Illinois Commerce Com.* (1979), 67 Ill. App. 3d 603, 606.) All parties in the present dispute agree that there are no factual questions on appeal; thus, we are not obliged to cloak the Commission's orders with a *prima facie* presumption of correctness.

■ We first examine the Commission's decision to limit the tax expenses associated with the contract plant which Citizens recovers in its rates to the actual tax liability attributable to the contract plant. Citizens argues that the Commission's treatment of tax benefits associated with the contract plant is contrary to the Commission's longstanding rule regarding treatment of these tax benefits. As an administrative agency, the Commission is not absolutely bound by its prior determinations. It may adjust its standards and policies in light of experience, if the adjustments are not arbitrary or capricious. See *City of Chicago v. Illinois Commerce Com.* (1985), 133 Ill. App. 3d 435, 440-41 (and cases cited therein).

Illinois courts have not frequently dealt with the relationship between the Internal Revenue Code and utility rate regulation. In *City of Alton v. Commerce Com.* (1960), 19 Ill. 2d 76, because the utility opted for accelerated depreciation, the Commission allowed the utility to deduct from gross income the amount of taxes actually paid, plus the increment that would have been paid had the utility not exercised that option. The Illinois Supreme Court reversed the Commission's order, noting that while the Commission may allow the utility to defer its taxes, the benefit of the election of accelerated depreciation must go to the ratepayers and not to the utility shareholders.

In *Monarch Gas Co. v. Illinois Commerce Com.* (1977), 51 Ill. App. 3d 892, the court determined that because the utility company paid no income tax as a result of its election to have its stockholders assume the tax liability, the Commission properly rejected the tax expense claimed by the utility.

The United States Supreme Court considered a similar issue in *Federal Power Com. v. United Gas Pipe Line Co.* (1967), 386 U.S. 237, 18 L. Ed. 2d 18, 87 S. Ct. 1003. There, the utility was part of an affiliated group which filed a consolidated Federal income tax return which resulted in the affiliated group's paying a lower total tax than would have been due had the affiliates each filed a separate return. The utility argued that for ratemaking purposes in a test year, it should be allowed an amount for taxes equal to what it would have paid had it filed a separate return. The Supreme Court disagreed and held that the Federal Power Commission was correct in limiting the tax expenses charged to customers to the amount the utility actually

incurred. The court noted that if rates were fixed as the utility requested, the stockholders and the utility would recover not only the fair return to which they were entitled, but also the full amount of an expense never incurred.

■ We find the reasoning in these cases to be very persuasive. Thus, we find that the Commission's determination that the tax expenses associated with the contract plant which are collected through customers' rates should not exceed the utility's actual tax liability is sound, and the Commission may prospectively alter the manner in which it treats the contract plant for tax purposes. The Commission need not ignore the actual tax-saving impact of CUC's election to file consolidated returns and Citizens' customers should not be required to bear in their rates an imaginary level of income tax expenses which Citizens will never pay. However, it must operate in a prospective manner only.

We next examine the $4.2 million rate-base deduction. Along with its decision to alter its future treatment of the tax benefits associated with the contract plant, the Commission has determined that the income tax expenses it allowed Citizens to recover in its rates from 1958 through 1982 should have reflected depreciation deductions on the contract plant which were claimed for Federal tax purposes. The difference between the tax expenses customers paid to Citizens and the amount of taxes associated with the contract plant actually paid to the government during this period is $4.2 million. The Commission determined that those funds should now be treated as a form of cost-free capital upon which the utility is not entitled to earn a return. To prevent Citizens from collecting future returns on the undeserved assets, the Commission ordered that $4.2 million be deducted from Citizens' rate base.

Citizens argues that despite the Commission's attempt to characterize its action as a permissible and justified rate-base deduction, the Commission was in reality attempting to engage in retroactive rate-making, which is prohibited in Illinois. We agree and therefore reverse the orders of the Commission and the trial court.

■ In its order in the tax case, the Commission referred to "erroneous" and "improper" tax depreciation taken by Citizens' parent company and stated that the depreciation expenses should be reflected in Citizens' future ratemaking. The Commission's resulting "ratemaking adjustment," the reduction in Citizens' rate base, constituted retroactive ratemaking and was therefore beyond the scope of the Commission's authority. There is no indication that the tax depreciation taken by Citizens' parent was in any way illegal. From 1958

through 1982, Citizens charged rates established by the Commission as it was required to do. (See *Independent Voters v. Illinois Commerce Com.* (1985), 139 Ill. App. 3d 957, 962.) Although the Commission recently decided that it allowed Citizens to charge its customers too much for service for the past 25 years, it cannot now term the past rates "excessive" and set future rates based on the amount it concededly allowed Citizens to overcharge. Such action constitutes retroactive ratemaking and violates the long-standing rule in Illinois that rates are to be charged prospectively only. *Mandel Brothers, Inc. v. Chicago Tunnel Terminal Co.* (1954), 2 Ill. 2d 205.

The Commission attempts to argue that it has not engaged in retroactive ratemaking, but has made a simple reduction in rate base to prevent Citizens from earning returns on the noninvestor-supplied funds in the future. We are unpersuaded by the Commission's attempt to disguise its impermissible actions by giving them another name. Citizens points out that the $4.2 million in income tax expenses was never included in Citizens' rate base, so it is not necessary to remove that amount from the rate base to prevent Citizens from earning any return on the funds. In the brief the Commission filed with this court, it admitted that the contract plant "has always been excluded from rate base and, therefore, Citizens appropriately does not earn a rate of return on that plant."

We note further that reducing the rate base would have lowered the rates Citizens could have charged because future rates would have been determined by using the rate base adjusted by the Commission's improperly ordered reduction. Since the reduction was ordered solely to correct the Commission's perceived errors, Citizens would have been penalized for charging the rates previously established by the Commission.

The Commission argues that it should not be required to ignore the past when determining rates to be charged in the future. We agree with the Commission. Our decision does not require the Commission to ignore the fact that it allowed Citizens to charge rates which included hypothetical income tax expenses. The Commission is free to alter the way it treats the tax benefits associated with the contract plant, but any change in treatment must operate in a prospective manner only.

■ Citizens also contends that the Commission erred in reducing the income tax expense associated with the contract plant for the 1983 test year by $403,432, which is the amount attributable to depreciation deductions which Citizens claimed on the contract plant in 1983. Citizens argues that this specific tax expense adjustment is also

an improper attempt by the Commission to pass the tax benefits associated with depreciation on the contract plant to the ratepayers. We disagree. We previously discussed our approval of the Commission's assertion that the income tax expenses a utility charges in its rates should be no higher than the amount the utility actually owes. Furthermore, when the Commission made its decision, the reduction of the income tax expense for 1983 adjusted current ratemaking factors to reflect current tax realities. This situation is unlike the $4.2 million rate-base reduction which would have allowed past realities to have an impact on future rates.

Finally, we consider the Commission's decision to deny Citizens any working capital allowance. The need for working capital arises because of the time lag between the utility's obligation to pay expenses and the receipt of funds to pay those expenses. Working capital needs can be determined by performing fairly costly and time-consuming lead-lag studies, or by applying any of several formulas designed to estimate a utility's working capital requirements.

In the instant case, Citizens and the Commission staff determined the utility's working capital needs by using a formula. Citizens stated that the working capital requirement established by application of this formula yielded a much smaller allowance than did any of the formulas the Commission accepted in recent rate proceedings involving other utilities. Further, Citizens claims it submitted preliminary lead-lag study results which suggested the utility was entitled to a greater allowance. Using Citizens' formula, which it considered a reasonable approach, the Commission staff determined that Citizens was entitled to an allowance of approximately $587,000. The Commission denied Citizens any working capital allowance after it determined that the formula method of establishing a working capital requirement was unacceptable for Citizens and that Citizens had to prove an actual need for working capital. We reverse and remand for determination of a reasonable working capital allowance.

■ The Commission has used formulas to determine the working capital needs of utilities for years. At no point prior to its denial of the working capital allowance did the Commission notify Citizens that it had to perform a lead-lag study to prove actual need for working capital. Only after it denied Citizens' request for capital did the Commission disclose to its own staff and to Citizens that the formula method was unacceptable. Since no party to the proceedings even hinted that Citizens' request would be denied solely because it did not present results from an expensive, burdensome lead-lag study, Citizens had no opportunity to defend its proposed allowance against

methodological objections. Therefore, the Commission's denial on methodological grounds was unjust and unreasonable.

The Commission argues that it has only allowed small, unsophisticated companies to use the formula approach because they are not capable of performing the costly lead-lag studies. Citizens, however, pointed out that in 1984 the Commission approved a formula-based working capital allowance of over $1 million for a utility company which is substantially larger than Citizens.

The Commission also asserts that Citizens had notice that the Commission would not accept formula-based evidence as proof of Citizens' funding needs. We disagree. In Citizens' 1980 rate case, the Commission stated in its order that it was of the opinion that for a company as large as Citizens, some degree of proof was necessary to show that a real need for working cash existed and that Citizens *could* produce a useful lead-lag study from its records. In its 1982 rate case, Citizens and the Commission staff submitted lead-lag studies, both of which the Commission rejected on methodological grounds. In the 1982 rate-case order, the Commission did not suggest that Citizens would be required in the future to calculate its working capital needs solely on the basis of lead-lag studies.

It cannot fairly be asserted that the Commission's comment in the 1980 rate-case order constituted adequate notice that the Commission intended to deny Citizens formula-based working capital in all future cases. Thus, the orders of the Commission and the trial court which denied Citizens' working capital allowance must be reversed and the cause remanded for determination of a reasonable allowance. If the Commission continues to assert that the formula method is unacceptable, Citizens must be adequately informed and allowed a reasonable amount of time to complete a lead-lag study.

Reversed and remanded.

BARRY, P.J., and STOUDER, J., concur.