THE PEOPLES GAS, LIGHT AND COKE COMPANY, Petitioner, v. THE ILLINOIS COMMERCE COMMISSION *et al.,* Respondents.

First District (4th Division) No. 87—0556

Opinion filed September 8, 1988.

40

James Hinchliff, Gerard T. Fox, and William M. Lopez, all of Chicago, for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Kathleen Nolan, Special Assistant Attorney General, of Illinois Commerce Commission, of Chicago, of counsel), for respondent Illinois Commerce Commission.

James T. Ferrini, Richard C. Clark, Peter Kanaris, and Edward M. Kay, all of Clausen, Miller, Gorman, Caffrey & Witous, P.C., of Chicago, for respondent Alpha Baking Company, Inc.

JUSTICE McMORROW delivered the opinion of the court:

The Peoples Gas, Light and Coke Company (the gas company) sent a bill to Alpha Baking Company, Inc. (Alpha), based on an estimate of Alpha's gas consumption during a three-month period, May 1985 to July 1985, when the gas company's meter measuring Alpha's

consumption malfunctioned and underregistered the gas supplied to Alpha. Alpha unsuccessfully disputed the estimated bill in an action before the Illinois Commerce Commission. Thereafter, the gas company issued a second estimated bill for a subsequent eight-month period, September 1985 to April 1986, during which the same meter malfunctioned by again underregistering the amount of gas consumed. As with the previous underregistration, the second bill represented the difference between estimated consumption and the amount indicated on the meter's digital counter. Alpha applied to the Commission for a rehearing with respect to the gas company's second estimated bill. The Commission found that the gas company was at fault within the meaning of the Illinois Administrative Code (Code) (83 Ill. Adm. Code 500.190 (1985)) with respect to the second malfunction and therefore was not entitled to bill Alpha for the estimated consumption during this period. The gas company seeks direct appellate administrative review.

We affirm.

BACKGROUND

The meter which is the subject of this dispute is a rotary meter used only for high volume commercial and industrial customers. It is located in a remote area of Alpha's plant where the air temperature varies by as much as 30 degrees. Because the volume of gas consumed varies directly in proportion to the change in the gas temperature, accuracy requires an adjustment to the volume measurement to compensate for changes in gas temperature. To assure correct measurement of Alpha's consumption of gas, a temperature compensating instrument was mounted on the top of the meter to adjust for the variations in temperature. The gas company placed the instrument inside a locked metal box, which has a small window. The window displays the digital counter telling how many cubic feet of gas Alpha has used, which in turn determines how much it will be billed.

In February 1985, an internal gas company computer report indicated that Alpha's counter was registering an irregular consumption, which, under certain circumstances, may be attributable to factors other than a malfunctioning meter. In May 1985, the gas company conducted its annual inspection of Alpha's gas meter and found that the temperature compensating device was stuck at 100 degrees Fahrenheit. The gas company neither replaced the temperature compensating instrument nor performed any tests to determine which device or mechanism in the instrument was malfunctioning. It replaced the follower wheel, an integral part of the temperature compensating de-

vice. The gas company maintains that when the follower wheel was replaced, "all problems were solved," and that the gas temperature was in no way associated with the instrument malfunction. The gas company then sent Alpha a bill based on an estimate of Alpha's consumption for the period between March and May 1985. The estimate was derived from a reading of the veeder counter which registers the gas flow without compensating for changes in temperature. Above the veeder counter is written "UNCORRECTED READING."

In September 1985, Alpha filed a formal complaint with the Commission alleging that, with respect to the alleged underregistration for March to May 1985, the gas company was at fault with respect to the meter's malfunction. Alpha requested that the Commission order the gas company to credit Alpha for the difference between the registered consumption and the estimated consumption. The Commission denied Alpha's request. This denial was the Commission's original order (Original Order).

In April 1986, the gas company made a special inspection of the meter. Once again, the meter's temperature compensating device rested at 100 degrees. The gas company claims that the device functioned properly for five months after its replacement of the follower wheel in May 1985, but rested at full scale again in September 1985 and remained at full scale registration until the April 1986 inspection. The gas company sent Alpha a bill based upon the gas company's estimate of the instrument's underregistration of consumption from September 1985 until April 1986. On the basis of this second billing, Alpha applied to the Commission for a rehearing raising the issue of the gas company's compliance with the Commission's testing requirements.

In its order on rehearing (the Order on Rehearing), the Commission found the gas company "at fault for allowing the incorrect meter to remain in service *** since the prescribed tests for meter accuracy have not been performed." Specifically, it determined that in May 1985, when the first underregistration was uncovered, the gas company should have either removed the device from service or performed the three-temperature test required by section 500.190 of the Illinois Administrative Code (Code) when it receives a complaint and indication that a temperature compensation device incorrectly registers at high or low temperatures. (83 Ill. Adm. Code 500.190 (1985).) The Commission found that the gas company received a complaint and indication that the meter was malfunctioning, and that upon receipt of such complaint and indication, the gas company was obliged to either remove the meter or perform the three-temperature test to

be in compliance with the Code. Since the gas company did neither, the Commission concluded that the gas company could not render an estimated bill for consumption during the second malfunction of the meter and ordered the gas company to strike the estimated amount billed for that period. The Commission denied the gas company's request for rehearing, and the gas company seeks direct appellate administrative review.

OPINION

Initially, Alpha contends that this court lacks subject matter jurisdiction because the gas company filed its petition for review within 30 days after service of the Commission's denial of rehearing, pursuant to section 10—201(a) of the Illinois Public Utilities Act (Ill. Rev. Stat. 1985, ch. 111⅔, par. 10—201(a)). Alpha argues that the gas company's petition for review should have been filed within 30 days of the entry of the Commission's order denying rehearing, in accordance with Illinois Supreme Court Rule 303(a) (107 Ill. 2d R. 303(a)). Alpha contends that Supreme Court Rule 303(a) should prevail because it governs a matter within judicial authority and is in conflict with the statutory time period for the filing of a petition for direct appellate administrative review. (See generally *People v. Walker* (1988), 119 Ill. 2d 465, 475, 519 N.E.2d 890; *O'Connell v. St. Francis Hospital* (1986), 112 Ill. 2d 273, 281, 492 N.E.2d 1322.) We disagree.

■■ ■ Administrative review of agency decisions is properly an area subject to legislative control, and it is within the "authority of the legislature to fix the appropriate time within which to file a petition for review." (*City of Benton Police Department v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 7, 13, 497 N.E.2d 876, 881, *appeal denied* (1988), 118 Ill. 2d 541, 520 N.E.2d 383; see also *Hardee's Food Systems, Inc. v. Human Rights Comm'n* (1987), 155 Ill. App. 3d 173, 176-77, 507 N.E.2d 1300; but see *Consumers Gas Co. v. Illinois Commerce Comm'n* (1986), 144 Ill. App. 3d 229, 493 N.E.2d 1148.) Supreme court rules applicable to direct appellate administrative review evince the court's intent to defer to the legislative determination of statutory time periods for filing petitions for review. (*City of Benton Police Department v. Human Rights Comm'n* (1986), 147 Ill. App. 3d 7, 12, 497 N.E.2d 876, citing 107 Ill. 2d R. 335(h).) In light of the above, we conclude that Supreme Court Rule 303(a) does not preempt section 10—201(a) of the Public Utilities Act, that the gas company's petition was timely filed, and that appellate jurisdiction exists to review the Commission order.

On appeal, the gas company contends that the Order on Rehear-

ing must be reversed because the record shows that the gas company did not have a complaint or indication that the meter was underregistering between September 1985 and April 1986, that the two-temperature test to which the meter was subjected, after underregistration by the meter was discovered in May 1985, satisfied the purposes of the three-temperature test specified in the Code, and that the gas company was not at fault in allowing the meter to remain in service after the first malfunction.

The gas company argues that (1) the Commission Order on Rehearing is defective as a matter of law because it failed to make sufficiently specific findings of fact, (2) the Commission erroneously construed the complaint and indication requirement, (3) the Commission's evidentiary finding of a complaint and indication is factually insufficient, (4) the Commission mistakes mere negligence for a demonstration of fault, (5) the Order on Rehearing is inconsistent with the Commission's Original Order regarding the first meter malfunction, (6) the Commission's Order on Rehearing forbidding the gas company from billing Alpha imposes a penalty for meter failure not authorized by statute, (7) the Commission's Order on Rehearing forces the gas company to violate a statutory provision barring discrimination between customers, (8) the order is not supported by substantial evidence, and (9) the uncontradicted evidence supports the conclusion that someone tampered with the meter thereby rebutting any contention that the gas company is "at fault."

██ ■ We note that the scope of our review is limited to a determination of whether the Commission's findings have any reasonable foundation in the evidence, whether the Commission acted within its authority, and whether the Order on Rehearing infringes on a constitutional right. (*Independent Voters of Illinois v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 95, 510 N.E.2d 850, 853; Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(e)(iv)(A).) The rules, regulations, orders, and decisions of the Commission must be held "*prima facie* reasonable" and any findings or conclusions on questions of fact must be held *prima facie* to be true and correct. The burden of proof on all issues rests with the party appealing from the Commission's ruling. Ill. Rev. Stat. 1987, ch. 111⅔, par. 10—201(d).

The issues presented for review are determined by the application of certain provisions of the Illinois Administrative Code. As pertinent to this case, 83 Illinois Administrative Code section 500.240(a)(3) provides:

"If the meter be found to underregister, the utility may render a bill to the customer for the estimated consumption not cov-

ered by bills previously rendered during the period of inaccuracy as defined above. Such action shall be taken, however, only in the event the bill for estimated inaccuracy amounts to 50 cents or more, *and such bill shall be conditional upon the utility not being at fault for allowing the incorrect meter to remain in service. The utility shall in no case render a bill for underregistration where a meter has been found slow, unless the particular meter has been inspected and tested in conformity with Sections 500.190, 500.200, 500.210, 500.215 and 500.220.*" (Emphasis added.) (83 Ill. Adm. Code 500.240(a)(3) (1985).)

83 Illinois Administrative Code section 500.190(b) provides:

"In the event of complaint and indication that a temperature compensating meter is not registering correctly at high or low temperatures, said meter shall be tested at zero degrees Fahrenheit, 60 degrees Fahrenheit, and 100 degrees Fahrenheit, to determine the accuracy of said meter." 83 Ill. Adm. Code 500.190(b) (1985).

I

■ The gas company contends that the Commission's Order on Rehearing is impermissibly vague regarding how the gas company's duty to perform the three-temperature test arose, when the duty arose, or why the gas company is "at fault." The Commission findings must be sufficiently specific to allow intelligent review. (See generally *Cerro Copper Products v. Illinois Commerce Comm'n* (1980), 83 Ill. 2d 364, 369-70, 415 N.E.2d 345; *Kewanee & Galva Ry. Co. v. Illinois Commerce Comm'n* (1930), 340 Ill. 266, 269, 172 N.E. 706; Ill. Rev. Stat. 1987, ch. 111⅔, par. 9—241.) The Commission argues that its Order on Rehearing is sufficiently specific to permit review of whether the gas company was precluded from recovery for the estimated underregistration which occurred from September 25, 1985, until April 15, 1986.

■ In its Order on Rehearing, the Commission determined that at the commencement of the second period of underregistration the gas company "had the benefit of complaint and indication that the temperature compensating instrument did not register correctly." In support of its finding of complaint and indication, the Commission relied upon the gas company's internal computer checks which indicated an irregularity in registration in February 1985 and the gas company's annual testing of its meter in May 1985, which revealed that the temperature compensating device was stuck at 100 degrees.

It also relied on the fact that Alpha filed a complaint on September 20, 1985, five days before the second malfunction was uncovered, alleging that the meter was not registering properly at the time of the first malfunction. On these findings, the Commission concluded that the gas company "has been on notice since the filing of the original complaint on September 20, 1985, and before that through its own internal checks, that the meter on [Alpha's] premises was not registering correctly." As a result of these factual findings, the Commission concluded that the gas company was at fault for neither testing the meter nor removing it from service, as prescribed in the Code. We find this a sufficiently specific explication of how and when the duty arose and hold that the order sufficiently states the Commission's basis for its finding of fault. We are unable to conclude that the order was so lacking in specificity as to prevent intelligent review.

## II

■ The gas company contends that the Commission erroneously interpreted its own rules regarding what constitutes a complaint and indication. In reviewing the Commission's construction and application of technical rules and regulations, the court must accord great weight to the Commission's decision because it is essential that the determination of issues requiring professional competence capable of evaluating technical data and expert opinion be made by the tribunal appointed by law and informed by experience. (*Village of Apple River v. Illinois Commerce Comm'n* (1960), 18 Ill. 2d 518, 523, 165 N.E.2d 329, 332; accord *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 478 N.E.2d 1369.) Moreover, deference is accorded the interpretation of the authoring agency in the construction of its rules and regulations. *Barbosa v. Committee on Accountancy* (1988), 171 Ill. App. 3d 782, 786.

■ The gas company claims that the Commission's definition of the words "complaint and indication" in the Code is vague. The gas company's argument presupposes that a "complaint" must emanate from the consumer and that it must explicitly state that the underregistration was caused by the malfunctioning of the temperature compensating device at high or low temperatures. The Commission observed that "complaint and indication" is not restricted to a complaint received from a customer because consumers are not expected to have knowledge of or expertise in the operation of gas company meters. The Commission found that the internal complaint generated by the gas company's computer, signaling that gas con-

sumption registered was unusually low in February 1985 constituted an internal indication of malfunctioning. That indication, the annual inspection in May 1985, which revealed that the temperature compensating device remained at 100 degrees, and Alpha's formal complaint constituted "sufficient notice of the instrument's unreliability" to obligate the gas company to either remove the meter or to perform the tests required under section 500.190. The internal computer report, the unambiguous results of the annual inspection, and Alpha's formal complaint gave the gas company notice before the second underregistration began that the instrument was registering incorrectly at high or low temperatures. The Commission held this sufficient to constitute complaint and indication. We hold that the Commission's construction of its own rule was not unreasonable.

The more narrow interpretation of "complaint and indication" advanced by the gas company would thwart effective enforcement of the Commission's rules. To require that the consumer discover the meter problem and register a complaint with the gas company before an obligation arises on the part of the gas company to perform tests of the meter's accuracy would unduly limit the application of the rule to consumers who possessed sufficient technical expertise to uncover the cause or existence of a malfunction. When the gas company acquires knowledge that the meter registers improperly at high or low temperatures, the Commission charges it with the duty to perform the three-temperature test or remove it from service. The Commission properly noted that the "burden is upon the [gas company] to establish internal procedures insuring the accuracy of its meters and to be on guard for incorrect registration." Unless the Commission is given the latitude to enforce the rules and regulations it authors, it cannot effectively protect consumers. (*Cf.* W. Mosher & F. Crawford, Public Utility Regulation 174-79 (1933).) Taking into consideration the legitimate public concern for the accuracy of all meters as expressed by the legislature (Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—301), we conclude that the Commission properly applied the complaint and indication requirement of section 500.190.

### III

■ The gas company also complains that the Commission's finding of complaint and indication fails to specifically state that the incorrect registration occurred at high or low temperatures. (83 Ill. Adm. Code 500.190 (1985).) We conclude that the Order on Rehearing adequately sets out the nature of the complaint and indication. The Commission underlined the importance of the adjustment made

by the temperature compensating instrument in determining the actual amount of gas consumed. Without the instrument, the gas is measured as if it were at a constant 60 degrees, and gas consumption is measured incorrectly whenever the temperature rises above or falls below 60 degrees.

The Commission concluded that the underregistration of gas was "due to the arm of the temperature compensating instrument having come to rest at the 100 degree Fahrenheit point, causing the gas to be measured as if it had expanded, resulting in [underregistration] of the amount of gas used." The Commission found that in May 1985 the gas company discovered the temperature compensating instrument resting at full scale or 100 degrees. Thus, in May 1985, the gas company had the benefit of an indication that the meter was not properly registering at high or low temperatures; the faulty instrument caused the counter to register incorrectly at all temperatures. The Commission explicitly rejected the gas company's argument that incorrect registration at all temperatures was distinguishable from incorrect registration at high or low temperatures, and concluded that "registering improperly" includes improper registration at high or low temperatures. While it is true that the Commission did not repeat verbatim the words of section 500.190(b) in its finding, we conclude that the Order on Rehearing was sufficiently inclusive and clear.

## IV

The gas company also contends that the Commission erroneously interpreted the term "at fault" to mean negligence. (83 Ill. Adm. Code 500.240(a)(3) (1985).) The gas company relies on *Illinois Power Co. v. Champaign Asphalt Co.* (1974), 19 Ill. App. 3d 74, 310 N.E.2d 463. This reliance is misplaced. The *Illinois Power* court rejected a negligence definition of "at fault," and defined "fault" as the failure of the utility to perform the tests required by the Commission. (19 Ill. App. 3d at 79-80.) In the instant case, the Commission concluded that the gas company was at fault precisely because it failed to perform required tests. Therefore, we believe that the Commission's definition of "at fault" is identical to the definition employed by the court in *Illinois Power.*

## V

The gas company next complains that the Commission Order on Rehearing in which the Commission found the gas company at fault is inconsistent with its Original Order in which the Commission

found the gas company was not at fault. According to the Commission, the two orders may be distinguished because after the finding of no fault in the Original Order, the gas company knew that the instrument registered incorrectly at high or low temperatures. The first estimated billing was permitted because the record showed no reason for the gas company to anticipate incorrect registration and the gas company did not have the repeated notice of the instrument's unreliability. There is nothing in the record to demonstrate that the gas company had prior notice of the malfunctioning of the temperature compensating instrument on which the Commission permitted an estimated billing. By contrast, the gas company was put on notice of the instrument's unreliability after the underregistration in May 1985. That notice, the Commission held, compelled the gas company to perform the prescribed testing or remove the instrument from the premises in order to be in compliance with the Code. Although both the first and second underregistrations stem from the same defective device, the gas company was not obligated to perform the three-temperature test until it discovered that the device was registering improperly in May 1985. We conclude the Order on Rehearing finding the gas company at fault with regard to the second underregistration is consistent with its Original Order finding no fault with respect to the first underregistration.

■■■ We also note that an inconsistency in Commission orders does not compel reversal of the subsequent order. Commission orders are not *res judicata*. (*Citizen Utilities Co. v. Illinois Commerce Comm'n* (1987), 153 Ill. App. 3d 28, 32, 504 N.E.2d 1367; *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 440, 478 N.E.2d 1369.) Our supreme court has noted that it is inherent in the concept of public regulation that the Commission "shall have power to deal freely with each situation as it comes before it, regardless of how it may have dealt with a similar or even the same situation in a previous proceeding." *Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 513, 116 N.E.2d 394, 396-97; accord *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 440, 478 N.E.2d 1369.

## VI

■■■ The gas company also challenges the legality of section 500.240(a)(3) forbidding the gas company from rendering an estimated bill where it is found to be at fault. (83 Ill. Adm. Code 500.240(a)(3) (1985).) The gas company argues that reimbursement of any testing fee expended by the consumer is the only permissible

sanction against utilities whose meters are found to be defective (Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—301) and that precluding estimated billing is an impermissible penalty because such preclusion is not indicated as a possible penalty in the Public Utilities Act (Act) (Ill. Rev. Stat. 1987, ch. 111⅔, par. 1—101 *et seq.*). The contention regarding the legality of section 500.240(a)(3) is deemed waived and is not considered because it was not raised prior to the filing of the gas company's reply brief. See *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 516, 524 N.E.2d 561; 107 Ill. 2d R. 341(c)(7).

In addition, we note that such arguments are implausible. The Commission is empowered to "establish reasonable rules, regulations, specifications, and standards to secure the accuracy of all meters." (Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—301.) Given the broad statutory delegation of authority to the Commission, a court must rely on the Commission's interpretation of the statute, if there is a reasonable debate as to its meaning. (*Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948, 957; accord *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 512, 524 N.E.2d 561; *Illinois Power Co. v. Illinois Commerce Comm'n* (1986), 111 Ill. 2d 505, 510-11, 490 N.E.2d 1255.) Since the inception of public utilities regulation, it has been clear that exploitation of consumers may result if they are not protected by a proper inspection service. (W. Mosher & F. Crawford, Public Utility Regulation 178 (1933).) The Commission's authority to secure the accuracy of meters employed by public utilities has long been recognized in Illinois. See, *e.g., City of Chicago v. Chicago Great Western Ry. Co.* (1932), 348 Ill. 193, 180 N.E. 835; *Kirwin v. Peoples Gas Light & Coke Co.* (1988), 173 Ill. App. 3d 699.

While the legislature provided many explicit sanctions which may be employed by the Commission, the legislature expressed no intent to limit the Commission to the enumerated methods of enforcement. We do not find the legislature implied in the Act any intent to limit the Commission to any set of specific procedures. Rather, we believe the legislature implicitly authorized the Commission to formulate rules necessary to secure meter accuracy, a goal specifically mentioned by the legislature. (Ill. Rev. Stat. 1987, ch. 111⅔, par. 8—301.) We also find no conflict with any of the statutory provisions authorizing the gas company to bill for its gas, since these provisions do not require the Commission to allow estimated bills in all circumstances. (See Ill. Rev. Stat. 1987, ch. 111⅔, pars. 9—241, 9—242, 9—243.) In sum, we conclude that the gas company has not rebutted the

presumption of reasonableness accorded Commission rules and regulations. Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(d).

## VII

■■ The gas company also argues the Commission's Order on Rehearing forces the company to treat Alpha differently from other customers and thereby violates the antidiscrimination provision of the Illinois Public Utilities Act. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 9—241.) However, thére is nothing in the record to suggest that other gas company consumers would have been accorded different treatment by the Commission in the same circumstances. We determine that the Commission's Order on Rehearing did not obligate the gas company to engage in unreasonable discrimination among its gas customers.

## VIII

■■ The gas company argues that there is no substantial evidence to support the Commission's finding that the gas company should have performed the three-temperature test. (See Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(A).) As stated previously, our review of the Commission's findings is confined to the issue of whether the findings have any reasonable foundation in the evidence. (*Independent Voters of Illinois v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 90, 95, 510 N.E.2d 850, 853.) Having accepted the Commission's interpretation of section 500.190, we find that the undisputed facts which appear in the record sufficiently support the Commission's conclusions. The Commission interprets the rule to require the gas company to perform the three-temperature test once it is aware that the meter is registering improperly at high or low temperatures. The Commission regards different testing and all other remedial conduct by the gas company as irrelevant. Thus, it does not matter whether the gas company performed a two-temperature test or whether it attempted to fix the instrument. The Commission's application is straightforward and clear-cut: because the company knew the meter registered incorrectly at high or low temperatures, it had a duty to either remove it or perform the prescribed test. Since the gas company did neither, the Commission found it at fault. See 83 Ill. Adm. Code 500.190, 500.240 (1985).

The gas company predicts the practical effect of the Commission Order on Rehearing will be to force utilities to replace such instruments if one part malfunctions and causes improper registration at high and low temperatures. We disagree. The Commission's Order on

Rehearing permits replacement of any malfunctioning parts as long as the utility performs the required three-temperature test.

The gas company argues that it substantially complied with section 500.190 by performing a two-temperature test. (83 Ill. Adm. Code 500.190(b) (1985).) It asserts that the two-temperature test the gas company administered would have uncovered any defect that the three-temperature test would have disclosed and therefore served the purpose of the tests prescribed by the Code. It claims that although it did not perform the two-temperature test until April 1986 it "is reasonable to conclude that the Instrument *** would have passed that test on an earlier date."

No exception exists in the Code for substantial compliance and we do not see fit to create a judicial exception. Under the Code, an "exemption" may be granted or a "deviation" may be authorized upon the utility's filing of a verified petition detailing the conditions, reasons, and purpose of such a modification. (See 83 Ill. Adm. Code 500.30 (1985).) Upon notification or complaint of the malfunctioning, the gas company did not elect to pursue the procedure prescribed in the Code. We find insufficient evidence in the record for this court, as a court of review, to establish that the two-temperature was an adequate substitute for the three-temperature test. The gas company states that the two-temperature test subjecting the device to a high temperature of 84 degrees would have uncovered any problem detectable by the three-temperature test. The gas company argues that since the plant did not become warmer than 80 degrees, a test at 84 degrees is sufficient. However, the gas company elicited no expert testimony contradicting the assertion of Alpha's expert that the 100-degree temperature simulated in the three-temperature test would be uniquely effective in exposing potential registration problems. An Alpha expert witness testified that the three-temperature test might have uncovered the problem that caused the malfunction because subjecting the device to more rigorous circumstances than normal might reveal problems with the "bindings or linkage or interference or improper calibration," and that the defect that caused the device to remain at 100 degrees "might have been brought out at the high temperature end of the scale when the arm went to the complete full scale end of the drum."

Richard Brouillette, a gas company employee, testified that the company could not perform the three-temperature test even if the test was indicated because the company did not possess the equipment to perform that test. Although he stated he did not thoroughly explore the availability of such equipment, he testified that such

equipment was not reasonably priced. However, the Commission's rules obligate the gas company to provide such equipment where the test is required. (See 83 Ill. Adm. Code 500.180(e)(2) (1985).) Consequently, we do not see fit to carve out a substantial compliance exception to the Commission's rule. In addition, we cannot find, based on the evidence in the record, that the gas company substantially complied with the Code even if such an exception existed.

 The gas company maintains the Commission's Order on Rehearing must be reversed, because uncontradicted evidence in the record establishes that the malfunction was externally caused, and therefore the gas company was not "at fault." One of the gas company's employees testified that the malfunction of the device "may" have been caused by someone or something bumping the meter. However, he admitted there were no marks or physical indications of such a bump to support such a theory. Also, there was contradictory testimony about the sensitivity of the instrument to physical contact. Where expert testimony is conflicting, this court must give great weight to the findings and conclusions of the Commission which is qualified by experience and special study to weigh the facts and circumstances. (*Commerce Comm'n ex rel. City of Bloomington v. Cleveland, Cincinnati, Chicago, & St. Louis Ry. Co.* (1923), 309 Ill. 165, 170, 140 N.E. 868, 870.) The Commission concluded that there was no physical evidence to indicate the delivery of an external blow sufficient to cause the indicator arm to move across the instrument. We find that the Commission's findings are supported by the evidence and that those findings provide sufficient basis for the Commission's Order on Rehearing.

For the reasons stated above, the order of the Illinois Commerce Commission is affirmed.

Affirmed.

JIGANTI, P.J., and JOHNSON, J., concur.