MUNICIPALITY OF PRINCETON, et al., Plaintiffs-Appellants, v. THE ILLINOIS COMMERCE COMMISSION, Defendant-Appellee—(NORTHERN ILLINOIS GAS COMPANY, Intervenor-Appellee.)

(No. 73-148;

Third District—March 8, 1974.

William Miller, of Washington D.C., and Karl G. LaPinska, of Princeton, for appellants.

James Sullivan, Assistant Attorney General, and Robert Helman, both of Chicago, and Donald Martin, of Princeton, for appellees.

Mr. JUSTICE ALLOY delivered the opinion of the court:

This is an appeal from an order of the Circuit Court of Bureau County affirming an order of the Illinois Commerce Commission.

In this appeal we are asked to review an order of the Illinois Com-

merce Commission, subsequently affirmed by the Circuit Court of Bureau County, which granted to Northern Illinois Gas Company the authority to curtail its "off-peak" sales of natural gas to some two hundred customers. Three of such customers, *viz.*, the municipalities of Princeton, Rantoul and Farmer City, are the appellants and, for the most part, the issues on appeal center around that part of section 49a of the Illinois Public Utilities Act (Ill. Rev. Stat. 1971, ch. 111⅔, par. 49a), which provides:

> "The commission, after a hearing upon its own motion or upon petition of any public utility, shall have power by order to authorize or require any public utility to curtail or discontinue service to individual customers or classes thereof, * * * whenever and to the extent such action is required by the convenience and necessity of the public during time of * * * *shortage of fuel,* * * *." (Emphasis added.)

"Off-peak" sales of gas, also sometimes referred to as "summer valley" or "dump" sales, had their origin in a bygone era when distributors such as Northern could obtain unlimited supplies of natural gas, and when the sophisticated underground storage facilities of the present day were lacking. As a general rule, rates for the gas were such that it was advantageous for the distributor utility, and ultimately for its customers, to take natural gas each day as close to their maximum demand as possible so as to reduce the average cost of gas. In warm weather, when the use of gas was down and storage facilities were filled to capacity, the distributors found themselves with an excess of gas over and above that needed to provide service to their firm, year-round customers. As one solution for the disposal of such excess, the distributors, as described by the court in *Produce Terminal Corp. v. Commerce Com.*, 414 Ill. 582, at page 587: "* * * hit upon the plan of selling this excess gas at 'off-peak' rates for customers who would be willing to use gas as an alternate to their regular fuel during the warm periods of the year when the general customers' demands were low. Since these off-peak customers would be required to maintain both their regular equipment for their customary fuel, and also alternate equipment to burn off-peak gas, and because this gas must necessarily meet the competition of other available fuels, it was necessary to set the off-peak rates lower than the rate to general customers."

So far as the present appeal is concerned, the municipalities of Princeton, Rantoul and Farmer City, which use the gas to fuel municipal electric generating facilities, were, on January 25, 1971, among the customers to whom Northern was under contract to sell off-peak gas. At that time, and for several years prior thereto, each municipality was using gas

exclusively as its fuel, and gas purchased under the off-peak contracts represented about 15% of their total annual needs. This is the gas supply affected by this proceeding. In addition, and under separate contracts, each of the municipalities was purchasing the remaining 85% of their annual gas needs from Northern as a firm, year-round customer. The latter contracts and the gas supplied thereunder are not affected by this proceeding. Each of the municipalities also has equipment which permits oil to be used as an alternate fuel, and there is evidence in the record that the municipalities' annual expenses for fuel and maintenance will increase, the full amount dependent in part on load growth, if they suffer the loss of their supplies of off-peak gas.

Proceeding under section 49a, Northern, on January 25, 1971, filed a petition with the Commission seeking authority to make curtailments in its sales of off-peak gas, and to put into effect certain rate schedules filed in connection therewith. Notices were given to all off-peak customers as required by the Act; many of such customers were permitted to intervene; orders were entered suspending the proposed rate schedules pending the Commission's determination pursuant to the petition; and extensive hearings were held at which both sides introduced evidence and were permitted to cross-examine witnesses. The proceeding culminated with an order of the Commission entered December 22, 1971. By the terms of the order Northern was given authority to curtail its sales of gas to off-peak customers, the orders suspending the proposed rate schedules were rescinded, and the schedules were approved with effect from December 28, 1971.

Due to the length of the proceeding the first curtailments occurred in 1972, and it appears that none of the municipalities received off-peak gas. Northern's curtailment plan was received into evidence and in light of the municipalities' claim that the plan will cause an abandonment of off-peak service, rather than a curtailment thereof, it is noteworthy that the Commission: (1) made a finding that it had continuing authority to review the matter and to require Northern to amend its tariff provisions with respect to off-peak service, and (2) directed in its order that Northern file reports with the Commission on March 31 in each year, setting forth its anticipated deliveries from each of its pipeline suppliers for the ensuing years and the actual deliveries from such suppliers for the year ending.

The 3 municipalities here involved filed a petition for rehearing, as did some 32 of the other intervenors, but such petitions were denied. Thereafter, so far as we are able to determine, only the municipalities sought judicial review in the circuit court, and, as noted, before, they here appeal from a judgment affirming the order of the Commission.

Evidence in the record pertinent to the issues on appeal disclose that Northern distributes natural gas to some 1,150,000 customers in 35 counties located in northern Illinois. Of this number, more than 1,060,000 are firm year-round residential customers. It was estimated that Northern would be called upon to provide service to approximately 17,000 new residential customers in 1971 and in each of several years thereafter, and to approximately 20,000 new apartment buildings and other multi-family unit customers, which are classified as commercial customers. Based upon such estimates, service will be sought in each year for about 140,000 additional persons. Briefly, it is the proposal of Northern to sell part of its gas supply to new customers in apparent preference to continuing its sales to off-peak customers which gives rise to one of the issues in the case. With regard thereto, and based on the record, it is Northern's position that it no longer has an off-peak season in which there is an excess of gas due: (1) to summer curtailments imposed upon it by its principal supplier of gas; (2) to its present inability to increase its gas supply from other sources; (3) to the increasing demand for gas by firm year-round customers; and (4) to the growth of its storage capacity in recent years. Based upon these factors, witnesses for Northern testified to the effect that all gas received from its suppliers throughout the year is now needed, either directly or by means of injection into and withdrawal from storage reservoirs, to serve firm year-round customers. Viewed in the context of the issues on appeal, the conclusion to be reasonably drawn from all the proof is that Northern could continue to fulfill its contracts with its off-peak customers, if it would deny service to new customers. At the same time, however, it also appears that even if curtailment of off-peak customers is permitted, Northern will not realize a saving of gas in an amount to satisfy the needs of the estimated load growth of firm, year-round customers.

There was proof, and we know of common knowledge, that there is a critical shortage of natural gas on a national level, one effect of which has been a fluctuation in the gas supply available to distributors and users in Illinois. Northern's principal supplier (77%) is Natural Gas Pipeline Company of America and the latter, in 1970, petitioned the Federal Power Commission (FPC) for authority to make curtailments in the flow of gas to its customers beginning in 1970. As a result of the proceeding, Natural was authorized to make curtailments in 1971, and, so far as Northern is concerned, its yearly contract demand entitlement was reduced by approximately 10%. Based upon estimates that available gas would increasingly diminish during the years 1972, 1973 and 1974, Natural also proposed to seek further curtailments for each of those years in the same proceeding; however, because the supply of natural gas is

in a constant state of fluidity and uncertainty, an agreement was negotiated, subject to the approval of the FPC, that the exact amount of future curtailments would depend on Natural's supply situation from time to time. During 1971, while the present proceeding was being heard, still another supplier of Northern (8%) filed a petition with the FPC seeking to curtail sales of gas to its distribution company customers.

Although Natural was given authority to reduce Northern's yearly contract demand entitlement by 10%, such reduction did not have the immediate effect of reducing the amount of gas actually received by Northern. The existing contract between Natural and Northern was entered into in 1970, and the proof shows that the latter did not receive its full contract demand entitlement in 1970, and that it would not do so in the years 1971, 1972 and 1973. But, at the same time, the proof also shows that the amount of gas received by Northern in 1971, and to be received in 1972 and 1973, exceeded the amount it had received in 1970. Due to the length of the proceedings before the Commission there were no curtailments of service to off-peak customers in 1971, thus, in actuality, the supply situation in 1972 becomes our point of focus.

Considering the task of the Commission in a proceeding to curtail under section 49a, we believe it pertinent to note that curtailment of off-peak sales was but one of several steps taken by Northern when confronted with the national shortage and the efforts of its suppliers to obtain reductions in their contract obligations. Since 1970, pursuant to Commission orders, sales to customers wishing new or additional service have been restricted to those whose daily demands would not exceed a fixed limit per day, the limit being of a nature that new service can be extended only to residential and small commercial and industrial users. Even then not all applicants could be accommodated, and Northern had a substantial waiting list at the time of the hearing. Additionally, Northern has virtually ceased all sales of interruptible gas; has cut back its sales promotion and advertising practices; has terminated multi-family space heating allowances; and has been active and financially involved in exploring for and developing new reserves and sources of gas. By a Commission order entered subsequent to this proceeding, of which we may take judicial notice, Northern has been authorized to expend $50,000,000 for the construction of a plant to manufacture gas from liquid hydrocarbons. Despite these activities, witnesses expressed the opinion that a complete solution of Northern's gas needs was not yet in sight.

■■■ As is true in all cases involving judicial review of Commission orders, we are without authority to try the case anew upon the record, to substitute our judgment for that of the Commission, or in any manner

to revise or modify its order. Rather, the only issue presented for review is the reasonableness and lawfulness of the order and, in consideration thereof, our inquiry is confined to the jurisdiction of the Commission, to the questions of whether its order and findings are against the manifest weight of the evidence, whether the Commission has acted beyond its authority, and whether it has infringed upon substantial constitutional rights (see *Sunset Trails Water Co. v. Commerce Com.*, 7 Ill.App.3d 449; *Gardner v. Commerce Com.*, 400 Ill. 123; *Brotherhood of Railroad Trainmen v. Elgin, J. & E. Ry.*, 374 Ill. 60). As stated by the court in *O'Keefe v. Chicago Railways Co.*, 354 Ill. 645, 650: "Unless manifestly against the evidence, the finding of the commission within the scope of its authority is conclusive on the reviewing courts, * * * as we must accord to its decisions the strength due to the judgment of a tribunal appointed by law and informed by experience."

Patently aware of the foregoing limitations, the municipalities, who charge Northern with a profit motive, first contend that the proof failed to show a genuine "shortage of fuel". On this basis it is urged that the Commission's finding of a shortage is against the manifest weight of the evidence, that its order permitting curtailment therefore exceeded the authority granted to it in section 49a, and that the curtailment order effects a breach of Northern's contracts with its firm off-peak customers. In a closely related contention it is asserted that "Federal and Illinois precedents" require that a gas utility must first cease sales to new customers before initiating a plan to curtail service to existing customers.

In support of this contention that the proof failed to show a genuine shortage of gas, the municipalities rely upon two grounds. First, and foremost, they point to the proof which shows that Northern actually received more gas in 1971 and 1972 than it did in 1970 and, because of this, rationalize that there was thus no shortage of gas either when Northern petitioned for authority to curtail service to off-peak customers or for the year in which curtailment was first authorized. Second, they assert that the words "shortage of fuel", as used in section 49a, manifest a legislative intent that the authority to curtail could be exercised only in the situation where the state of fuel supplies makes it necessary to ration the fuel between existing users. Here, they say, such a situation did not exist, the proof showing instead only that any shortage is attributable to Northern's extension of service to new customers. We find no merit in either contention.

As to the latter, it is clear that the Commission is not compelled to wait for emergency or rationing conditions to arise, or to consider only the welfare of existing customers, before exercising its authority to

curtail. Speaking in *Wabash, C.&W.R.R. Co. v. Commerce Com.*, 309 Ill. 412, 419, our supreme court has said: "The Commerce Commission has a right to, and should, look to the future as well as to the present situation. Public utilities are expected to provide for the public necessities not only today but to anticipate for all future developments reasonably to be foreseen. The necessity to be provided for is not only the existing urgent need but the need to be expected in the future, so far as it may be anticipated from the development of the community, the growth of industry, the increase in wealth and population and all the elements to be expected in the progress of a community." The wisdom of these words is amply demonstrated by the energy crisis and its results, with which our nation and its people have been suddenly confronted at the present time. Applied to the present case, it would be foolhardy for the Commission to wait until there is an emergency shortage of gas before acting and it would be a breach of its public trust to concern itself only with the needs of existing customers. Manifestly, since section 49a is couched in terms of "the convenience and necessity of the public", the legislature could not have intended the curtailment authority of the Commission to be so narrowly circumscribed.

■ Similarly, in our opinion, the evidence showing that Northern would receive more gas in 1971 and 1972 than it did in 1970 does not cause the Commission's finding of a shortage to be against the manifest weight of the evidence. While Northern was to receive more gas in those years, further uncontradicted proof shows that the amount received would still not be enough to permit it to meet the needs of the public, residential customers in particular, in the area Northern, as a public utility, is required to serve. This, we believe, measured in terms of the public need and convenience, denotes a shortage of fuel within the meaning of the statute. Moreover, in view of the circumstance that Northern's ability to serve is directly dependent on the amount of gas it can expect to receive from its suppliers, it is unrealistic to say that the Commission, in determining whether there is a fuel shortage, must ignore the future or confine itself to the matter of Northern's individual gas supply in a given year or years. There is proof in the record and it is a matter of common knowledge that there is a critical shortage of natural gas on a nationwide scale, that reserves are dwindling and that new sources of supply have not as yet been found. As the record also shows, the contract demands of distributors such as Northern have already been curtailed with the blessing of Federal authorities and further curtailments are expected to follow. Adding these considerations to Northern's own situation of supply and public demand and need, we cannot say

that the Commission's finding of a shortage of gas was against the manifest weight of the evidence.

■■ In view of the shortage of gas, it is our opinion, like the Commission and circuit court before us, that the curtailment of sales to off-peak gas customers was reasonable and proper. As noted by the court in *Produce Terminal Corp. v. Commerce Com.,* 414 Ill. 582, 591, off-peak gas service was initiated "* * * only for the purpose of providing cheaper and better service to the general firm customers, by disposing of gas on hand over and above the current demand of the general firm customers." At the present time there is no excess supply of gas, and in view of the present gas shortage the basis for selling off-peak gas has disappeared. Since off-peak sales were conceived for the benefit of firm, year-round customers, it logically follows that they should be curtailed when that benefit no longer exists. Pertinent, also, is the circumstance that the off-peak customers have a capacity to use alternate fuel and thus are not deprived completely of a way to meet their fuel needs.

Frequent representations in the brief of the municipalities that the order authorizing curtailment exceeds the authority of the Commission because it effects a breach of their contracts with Northern for off-peak gas are also without merit. Section 49a expressly gives the Commission authority to curtail or discontinue service whenever it is required by the convenience and necessity of the public. Moreover, the contracts of the municipalities expressly state that the service shall be subject to Northern's tariff on file with the Commission from time to time, and that "in the event the conditions of service or charges are changed under authority of the Commission such changes will apply." The municipalities were thus on notice that their off-peak contracts were subject to change with Commission approval. In view of the authority given to the Commission in section 49a, it necessarily follows that any changes properly authorized by the Commission are incorporated into existing contracts. *Cf. City of Chicago v. Commerce Com.,* 356 Ill. 501; *United Gas Pipe Line Co. v. Memphis Light, Gas & Water Division,* 358 U.S. 103, 3 L.Ed.2d 153, 79 S.Ct. 194.

Section 49a makes no provision that a utility must first cease extending service to new customers before service to existing customers may be curtailed. Nonetheless, the municipalities endeavor to read such a condition into the statute with the unique contention that "Federal and Illinois precedents" require a gas utility to cease new sales prior to instituting a curtailment plan. Courts cannot read into a statute conditions or exceptions which depart from its plain meaning (*Nordine v. Illinois Power Co.,* 32 Ill.2d 421), but even if it were otherwise this contention is of no

avail. The "precedents" relied upon are certain orders of the FPC, a decision of a Federal court which reviewed such an order, a speech given by an Assistant Secretary of the Interior, and orders of the Illinois Commerce Commission approving plans of other Illinois distributors wherein off-peak sales were not curtailed. We see little useful purpose in discussing each of the precedents in detail. The Federal rulings and decisions advanced are not binding upon us, and, moreover, they deal with interstate pipeline suppliers and appear for the most part to have been based upon, or prompted by, express provisions of the Natural Gas Act (15 U.S.C.A. § 717 *et seq.*) which have no counterpart in section 49a. As for the speech referred to, it patently reflects only the views of the speaker and has neither force nor persuasiveness as a legal precedent.

■■ Just as clearly, the prior proceedings before the Commission, and the orders entered therein, cannot serve to control the order in the present proceeding. By the express language of section 49a, a petition filed thereunder by a utility for authority to curtail service presents a question of whether the curtailment sought is required by the necessity and convenience of the public. The doctrine of public convenience and necessity is a relative concept, rather than a matter of fixed or absolute rule, and thus it has long been established that the determination of whether the public convenience and necessity require a particular service of a public utility to be performed, dispensed with, or curtailed, must depend upon the particular facts of each case. (*Gardner v. Commerce Co.*, 400 Ill. 123.) Nothing in the record permits a conclusion that the facts and circumstances which led to the Commission orders in the other proceedings relied upon were identical with the facts and circumstances in the present proceeding and nothing in section 49a suggests that all gas utilities, each with its own unique supply and demand situation, must propose identical plans when a shortage of fuel occurs. Other distributors, serving other areas and other customers, and being supplied from other sources, could naturally be expected to propose plans differing from that proposed by Northern. Or, to state the matter in the context of the Commission's duty under section 49a, what is required for the public convenience and necessity will necessarily vary and be dependent upon the facts and circumstances surrounding each individual gas utility.

For their final contention the municipalities assert that certain portions of the Commission's findings are inadequate and against the manifest weight of the evidence. While some of the contentions made have already been answered herein, we find that none of the matters advanced were specifically raised in the petition for rehearing filed with the Commission. Accordingly, they are not properly before us for review and will

822

not be considered. *City of Granite City v. Commerce Com.*, 407 Ill. 245; *Centerville Township v. Commerce Com.*, 5 Ill.2d 72.

The judgment of the Circuit Court of Bureau County affirming the order of the Commission was correct, and such judgment is affirmed.

Judgment affirmed.

SCOTT, P. J., and STOUDER, J., concur.