GOVERNOR'S OFFICE OF CONSUMER SERVICES et al., Petitioners-Appellants, v. ILLINOIS COMMERCE COMMISSION et al., Respondents-Appellees.

First District (1st Division) Nos. 1—91—0045, 1—91—0143, 1—91—0149, 1—91—0173, 1—91—0208, 1—91—0209, 1—91—0213, 1—91—0214, 1—91—0297 cons.

Opinion filed December 28, 1992.—Modified opinion filed March 29, 1993.

Roland W. Burris, Attorney General, of Springfield (Robert W. Cushing and William F. Cottrell, Assistant Attorneys General, of Chicago, of counsel), for petitioner People *ex rel.* Roland W. Burris.

Jack O'Malley, State's Attorney, of Chicago (Thomas H. Rowland, Assistant State's Attorney, of counsel), for petitioner People *ex rel.* Jack O'Malley.

Kelly R. Welsh, Corporation Counsel, of Chicago (Brian Trubitt, Assistant Corporation Counsel, of counsel), for petitioner City of Chicago.

Stephen J. Moore, Public Counsel, of Chicago (Karen Lusson, Assistant Public Counsel, of counsel), for petitioner People *ex rel.* Office of Public Counsel.

Allen W. Cherry, of Legal Assistance Foundation, of Chicago, for petitioners South Austin Coalition Community Council, National People's Action, Community Action for Fair Utility Practice, Northwest Austin Council, Action Coalition of Englewood, and Chicago South Community Development Organization.

Jean M. Roche and Susan L. Satter, both of Chicago, for petitioner Citizens Utility Board.

Freeborn & Peters, of Chicago (Leland W. Hutchinson, Jr., and Elizabeth D. Sharp, of counsel), for petitioner Producer-Marketers Transportation Group.

James E. Weging, Special Assistant Attorney General, of Chicago, for respondent Illinois Commerce Commission.

James Hinchliff, T.M. Patrick, Gerard T. Fox, and Mary Klyasheff, all of Chicago, for Peoples Gas Light & Coke Co.

JUSTICE BUCKLEY delivered the opinion of the court:
This dispute arises from the Peoples Gas Light & Coke Company's (Peoples) proposal to the Illinois Commerce Commission (Commission) for rate increase and rate redesign for natural gas services. This is an appeal of the Commission's administrative order, entered on November 9, 1990 (Commission's order), pursuant to Illinois Supreme Court Rule 335 and section 10—201 of the Public Utilities Act (Act) in which the petitions for review have been consolidated. 134 Ill. 2d R. 335; Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201.
Initially, we must note that on May 13, 1987, the Commission ordered that the management practices of Peoples be audited pursuant

to the Public Utility Act (Act). (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 8—102.) The Commission hired Richard Metzler and Associates to conduct the audit (Metzler's audit). Metzler filed its audit with the Commission on November 18, 1988, in docket No. 1—87—0232, not the instant case. The report made 130 recommendations for improvements in Peoples' management practices. Metzler's audit quantified savings of between $71 and $105 million that could be realized annually if 27 specific recommendations were adopted.

On December 15, 1989, Peoples filed proposed new rates to be effective with service rendered on and after January 29, 1990, with the Commission. These rate sheets embodied a general increase in rates for gas service and other proposed changes, including changes involving Peoples' regulations regarding the transportation of customer-owned gas. The Commission issued a suspension order on January 10, 1990. The order suspended the proposed general increase in gas rates until May 13, 1990. The Commission, then, resuspended the general increase until November 13, 1990.

From February through August 1990, a Commission examiner held various hearings. Appearances were entered by Peoples, the Commission and the City of Chicago. Then, petitions to intervene were filed on behalf of the Office of Public Council, Small Business Utility Advocate, the Governor's Office of Consumer Services, National People's Action, the South Austin Coalition Community Council, Community Action for Fair Utility Practice, Northwest Austin Council, Chicago-South Community Development Organization, the Attorney General, the State's Attorney of Cook County, the Illinois Industrial Energy Consumers (IIEC), the Chicago Area Industrial Consumer Coalition, the Producer-Marketers Transportation Group (Producer-Marketers), the Citizens Utility Board, MidCon Marketing, the Illinois Department of Energy and Natural Resources, and the Center for Neighborhood Technology (collectively Intervenors). The hearing examiner granted the petitions.

Peoples entered voluminous evidence relating to the account books, the original cost of its utility plant, accumulated provision for depreciation, materials and supplies and gas in storage, other rate base items, operating revenues and operating expenses, rate-making adjustments, original cost rate base and the rate of return thereon, rate design, and charges and provisions related to the transportation of customer-owned gas. Peoples asserted that its revenue requirements would be $52.4 million in additional annual revenue, excluding add-on charges for revenue taxes. After the above evidence was introduced, the parties to this proceeding were afforded the opportunity to

offer proof and cross-examine witnesses. Briefs and reply briefs were filed by the various parties.

The hearing examiner denied Intervenors' request to admit Metzler's audit into evidence. Likewise, the hearing examiner denied Intervenors' motion to subpoena the Metzler auditors to testify to the methodology and results of Metzler's audit. Thereafter, the Commission denied Intervenors' petition for interlocutory review of the above decisions.

The record, however, contains Peoples' response to several of Metzler's recommendations, some of which indicate that the recommendations were rejected outright and others only partially accepted. Further, the responses indicated that 16 of the specific 27 recommendations for which Metzler quantified savings would be partially or wholly accepted. Peoples, therefore, expected a savings of $1.081 million.

On September 28, 1990, the hearing examiner issued a proposed order. Thereafter, briefs on exceptions and replies were filed by the various parties. On November 2, 1990, the Commission heard oral argument in this proceeding.

On November 9, 1990, the Commission entered its order in the proceeding, granting in part Peoples' request for the additional revenues necessary to establish just and reasonable rates, thereby authorizing Peoples to establish rates providing additional gas operating revenues of $27,574,000, exclusive of add-on charges for revenue taxes. Also, the Commission approved, in part, Peoples' proposals for revising its transportation service. Further, the Commission ordered that Peoples be given a return on common equity capital of 13.25%. The weighted average of this figure with other components of Peoples' capital structure produced an overall return on capital of 10.56%. On December 10, 1990, Peoples filed its petition for rehearing of the Commission's order. The Commission denied that petition on December 18, 1990.

COST OF COMMON EQUITY

Expert testimony regarding the cost of common equity was presented by four witnesses. Dr. John W. Wilson testified for Intervenors, recommending a maximum of 12% return on equity based upon a range of 11% to 12%. Wilson's recommendations were based upon a discounted cash flow (DCF) study and a comparable earnings analysis.

Dr. Charles M. Linke testified on behalf of Peoples. Linke recommended a 14% return on common equity based upon a range of 13.5% to 14.5%. Linke's DCF study produced a range of 12.9% to 13.9%,

and his risk premium study produced a range of 15% to 15.1% both with an upward .4% adjustment for flotation costs.

John Lawrisuk, Peoples' vice-president, also testified. Lawrisuk, however, stated that the upper end of the Linke range, 14.5%, should be used for the common equity return based upon a series of uncertainties that he contended would increase risk of an investment in the market, thereby resulting in the investors requiring higher returns when these uncertainties became known.

Michael Cole, financial analyst for the Commission's staff, recommended a 13.25% return on equity, the midpoint of a 12.75% to 13.75% range. Cole performed a DCF study on a sample of public utility companies resulting in a range of 11.2% to 12.64% and a DCF study on a sample of gas distribution companies resulting in a range of 12.07% to 12.92%. Cole's capital asset pricing model resulted in a range of 13.58% to 13.64% for the public utility sample and 13.46% to 13.75% for the gas distribution sample. The Commission adopted Cole's findings as "the most reasonable, unbiased and appropriate analysis of Peoples Gas' cost of capital." The Commission's order permits Peoples to collect $27,574,000 more per year from its customers.

The difference between the amount Peoples requested, $52 million, and the amount the Commission granted, $27,574,000, was the result of the Commission granting a lower return on common equity, reducing the rate base and disallowing expenses based on proposals of witnesses for the Commission's staff and Intervenors. Additionally, the Commission's partial rejection of Peoples' proposals for changes in transportation service were based on proposals of witnesses for the Commission's staff and Intervenors.

## TRANSPORTATION CUSTOMERS

The following is an explanation of what transportation customers are, how they use Peoples' system, and the testimony regarding them and their use. Peoples is a local distribution company serving gas users within the City of Chicago. Peoples obtains a large portion of gas from interstate pipelines, such as Natural Gas Pipeline Company of America and Midwestern Gas Transmission Company, and distributes the gas through its own pipeline system to residential, commercial and industrial end-users. Most of Peoples' customers are sales customers who buy gas directly from Peoples, which delivers the gas to them at the burner tip. Peoples supplies each of the sales customers with its entire gas needs under one of the rate classifications described in its filed tariffs.

Transportation customers of Peoples purchase gas from marketers or producers and have that "customer-owned" gas transported to the Peoples' system by various interstate pipelines. Transportation customers then pay Peoples a service charge for the privilege of transporting their customer-owned gas through Peoples' pipeline from the city gate to that customer's own facilities. The charges for transportation services are equal to the service charges of the companion sales rate plus additional charges arising from the alleged incremental administrative and metering costs associated with transportation customers. These service charges confer some "banking" and "balancing" rights to transportation customers through an allowable bank.

The Producer-Marketers are independent natural gas marketers and transporters who intervened in the Commission's proceeding because of the impact the proposed standby demand and standby entitlement charges would have on open-access transportation of natural gas. Until 1985, natural gas users had no choice but to purchase their natural gas supplies from a natural gas utility. Then, open-access of gas transportation was allowed. During oral argument, Commission's staff urged the Commission to take steps to ensure that the benefits of open-access transportation be preserved for Illinois consumers. The evidence showed that since 1985, the number of transportation customers has grown on Peoples' system to 9,000, representing 30% of the annual volumes of gas delivered to ultimate customers.

Jerry Dambra, a witness for Producer-Marketers, testified that the Archdiocese of Chicago is one of the largest transporters, with 751 accounts. Dambra further testified that the Archdiocese had saved $1 to $1.5 million per year over the cost it would have had to pay were it a sales customer. Dambra testified that losing its savings would increase the Archdiocese's operating losses by $1 million and might force it to close more schools in Chicago.

Kurt Siegel of the Evangelical Health Systems (EHS), the largest health care organization in Chicago, testified that EHS has saved almost $1 million since it began transporting gas in 1987. Siegel testified that EHS would suffer if its savings were lost because it would be forced to increase the costs of health care in a market where such costs are already considered too high.

Peoples admitted that it uses open-access transportation of gas to save approximately $150 million for its sales customers by reducing purchases of expensive pipeline gas. Peoples also admitted that any reduction of gas costs benefits Chicago's economy.

Deliveries of customer-owned gas do not always equal that particular customer's gas consumption requirements. If a transportation

customer delivers more customer-owned gas to Peoples than it demands from Peoples, then the excess deliveries go into an allowable bank that the customer can draw upon when its customer-owned gas deliveries to Peoples' system are less than its consumption requirements. If the transportation customer's consumption requirements are larger than the amount of customer-owned gas delivered to Peoples and the amount of gas in the customer's bank, then the transportation customer can purchase gas supplies from Peoples. The role of Peoples as a backup source of gas supplies is "standby service." Transportation customers may purchase backup reservations through a "standby demand charge" and a "standby entitlement charge" and may purchase backup gas through a "standby commodity charge."

Peoples obtains gas supplies for sales and standby service from various sources including purchases from interstate pipelines. These purchases are made pursuant to contracts or service agreements that give Peoples both the right to purchase a certain amount of gas on any given day and the right to purchase a certain amount over the course of a year. The right to receive a specific amount of gas on a given day is generally referred to in the industry as standby demand or D-1 charges. The charges for the right to receive specific amounts of gas over a one-year period are generally known as annual entitlement or D-2 charges. The right to receive standby demand service is critical on Peoples' peak day when Peoples' customers collectively request 100% standby service from Peoples.

During argument, Peoples claimed that transportation customers were not fairly bearing the cost of these reservation charges for standby demand and entitlement services. Peoples proposed recovering a total of $32 million from transportation customers through the imposition of standby demand and entitlement charges proposed under riders 17 and 17A. The proposed standby demand charge would shift $21 million onto transportation customers and $11 million would be collected from transportation customers through the imposition of the standby entitlement charge. Producer-Marketers did not oppose the imposition of standby charges as long as the charges reasonably represented the costs which are actually imposed by transportation customers in the aggregate on Peoples' system by requiring Peoples to provide standby service.

Dr. Bamberger, Producer-Marketers' expert, testified that the amount of D-1 reserved by Peoples could be reduced, resulting in savings of $27 million to all Peoples' customers. Peoples admitted that it was not purchasing its gas resources under long-term contracts. Peoples testified that it did reduce D-1 in 1989. Peoples claimed that it

could not presently reduce its D-1 and D-2 because under its customer contracts it might be called upon some day to provide 100% standby. Bamberger testified that if the obligation to provide standby service requires Peoples to purchase a higher level of standby services than it would otherwise purchase to serve the needs of its sales customers, then the costs of the extra gas resources which Peoples must purchase to provide standby service are the costs which should be properly collected from transportation customers.

The Commission's staff testified that Peoples' system peak day would not be expected to be the peak day for each and every transportation customer and recommended that this diversity in transportation customers' peak demands for Peoples' gas must be considered when determining standby charges. The Commission's staff testified that to ascertain that diversity factor, actual usage patterns of standby gas, not customer-owned gas, must be known. The Commission's staff testified that historical utilization should be kept by Peoples and analyzed in order to draw the most informed conclusions.

Peoples admitted standby charges should be based on the cost of providing it; however, it disagrees that historical utilization is relevant to the determination of proper cost-based charges. Instead, Peoples argued that the proper measure is what standby service transportation customers could ultimately demand because of their standby demand and standby entitlement reservations. Peoples admitted that the following circumstances must occur before the transportation group would impose costs on Peoples' system by requiring peaking resources:

(1) transportation customers in the aggregate must have burned all of their customer-owned gas;

(2) transportation customers in the aggregate must have burned all of their excess and allowable banks;

(3) it must be a peak day; and

(4) the conditions on that peak day must meet or exceed design peak day conditions.

Peoples did not present any evidence as to the actual amount of standby gas used by transportation customers. Peoples argued that sales customers were subsidizing service to transportation customers. Peoples never studied or determined how much standby service its transportation customers actually require because it does not keep those types of records. The information, however, could be compiled by manually reviewing each customer's account. Producer-Marketers introduced uncontroverted evidence that such an accounting would take Peoples no more than 73 hours at a cost of $2,000, using the

highest clerk rate to arrive at that cost. Moreover, Peoples admitted that by using standard estimation process, it could obtain an estimate of actual standby usage which would be fairly accurate. Peoples never prepared such an estimate.

Bamberger testified that assuming a peak month in future fiscal years which was similar to the weather characteristics of December 1989, transportation customers would require no standby service on a peak day to meet their gas needs if they began the month with their allowable banks filled to just 60% of the new levels proposed by Peoples. Bamberger concluded that the evidence showed that no interim standby demand charge was warranted because transportation customers have not been using any standby service on peak days.

Peoples initially failed to consider the concept of diversity. Later, Peoples suggested that a 90% diversity factor should be applied to the standby demand charge. Peoples, however, admitted that its recommendation was based on insufficient and unrepresentative evidence. One of Peoples' witnesses testified that even on a peak standby day, only a small percentage of transportation customers would actually use standby gas. In the Commission's staff's brief, it stated that it "reluctantly supported" Peoples' proposed interim diversity factor of 90%.

Bamberger conducted an analysis of the available information to determine the likely additional entitlement needs for standby service. Bamberger found that for the year ending January 1990, standby service accounted for 13.5% of total transportation customer sendout. Bamberger further speculated that various factors such as rider 17 storage and rider 17A variable standby would tend to reduce standby service in the future. Bamberger further found that standby service would not exceed 11.44 million dekatherms. Bamberger testified that at Peoples' revised rate of 1.68 cents per therm, the standby entitlement charge should equal $1.92 million rather than the $10.7 million proposed by Peoples. Bamberger recommended an 82% reduction in Peoples' proposal.

IIEC's Dr. Rosenberg concluded that Peoples improperly ignored customer-owned deliveries to Peoples' system in proposing its standby entitlement charges, resulting in inflated charges. Rosenberg recommended the adoption of a NI-Gas multiplier formula for the entitlement charge. Dr. Rosenberg analyzed transportation customers' use of system gas and the percentage of sales sendout which was met by contract gas for fiscal years 1987, 1988 and 1989. Based on Rosenberg's analysis, he recommended that an appropriate multiplier would be 10%.

Originally, Peoples proposed an entitlement charge of 1.86 cents per therm of gas which was calculated by dividing up the cost of reserving the entitlement on the pipelines by both sales and transportation customers' volumes. Peoples then modified this calculation slightly by changing the divisor to include annual throughput for rider 17 customers and volumes reserved by rider 17A customers, resulting in an entitlement charge of 1.68 cents per therm. Peoples continued to seek recovery of entitlement charges based on reserved amounts rather than on the likely actual use of standby gas by transportation customers. Peoples asserted that it must contract for supplies to meet its obligation to serve the transportation customers, up to the level of standby entitlement selected.

The Commission's staff concluded that Peoples' standby entitlement proposal would have the effect of overcharging transportation customers. Mr. Zuraski testified that the standby entitlement charge should be modified so that a variable representing the potential maximum total throughput, rather than aggregate D-2 nominations, be employed in the denominator of the charge. Zuraski also testified that the charge must be adjusted downward to reflect the extent to which customers can be expected to rely upon customer-owned versus company-supplied gas and to reflect month-to-month diversity in transportation customers' demand for company-supplied gas.

The Commission's staff did not introduce any evidence to support any recommended multipliers, even though it proposed a 90% multiplier. Then, the Commission's staff recommended a compromise figure of 50% as an interim multiplier while Peoples conducts a study to determine the appropriate standby demand and entitlement charge.

The Commission rejected Peoples' argument against utilizing historic usage. The Commission ordered Peoples to perform studies of transportation customers' use of its supplied gas to determine the proper multiplier based on a diversity factor to apply to the standby demand and entitlement charges. The Commission ruled that the multiplier determines the portion of demand-related gas charge that will be collected through the transportation customer's selected standby level and the portion that will be collected depends on the customer's actual consumption of standby gas. Since there was no evidence of transportation customers' actual usage of system supply gas from Peoples, the Commission ordered that an interim multiplier of 50% be applied to standby demand and entitlement charges and that these charges totalling $16 million be imposed on transportation customers.

### TRANSPORTATION CUSTOMERS PEAK DAY WITHDRAWALS

Transportation customers are also conferred certain banking and balancing rights through an allowable bank which permits transportation customers to bank a quantity of customer-owned gas in excess of the customer's requirements at no extra charge. The size of the allowable banks and limiting withdrawals from those banks were also issues before the Commission. The Commission adopted the IIEC's proposal that the allowable banks be calculated at 20 equivalent peak days. The Commission additionally agreed with the IIEC in restricting a transportation customer's peak day withdrawal from allowable banks to 60% of that customer's maximum daily demand.

The Commission's staff agreed with the above. The Commission's staff's concern was that absent a reasonable restriction, a transportation customer served under rider 17A could, through the utilization of his allowable bank, draw upon peak day supplies for which it is not paying. Mr. Zuraski, witness for the Commission's staff, agreed that transportation customers should get the services that they pay for under the service charges. Peoples did not perform any studies to determine whether transportation customers had used a disproportionate amount of stored gas on a peak day.

Bamberger testified that allowable banks are not additional peak day resources and, therefore, cannot have any effect on the real flow of gas throughout Peoples' system. Peoples and the Commission's staff argued that allowable banks are not in fact part of storage but are simply an accounting entry representing the excess of customer-owned gas delivered to Peoples over its deliveries of customer-owned gas to transportation customers.

Producer-Marketers argued that restricting peak day withdrawals would cause transportation customers to reserve higher levels of standby gas and cause Peoples to spend greater amounts for peak day resources than if withdrawals were not constrained. Producer-Marketers argued that transportation customers cannot respond to restrictions announced upon the 4 p.m. O'Hare forecast the preceding day because pipeline gas nominations must be changed between 8 and 10 a.m. the day preceding delivery.

The Commission's staff initially proposed that the restriction on transportation customers for peak day withdrawals from allowable banks be 46.7% of a customer's maximum daily demand. Peoples proposed a withdrawal limitation of 40.9% of maximum daily demand. Peoples adopted Zuraski's initial calculation and modified it by adding in a peak day reserve margin. Peoples' calculation does not consider

diversity among transportation customers in the withdrawal of storage gas. The IIEC proposed that, if any bank limit was imposed, the restriction should be 75%. Then, the Commission's staff revised its position and stated that 60% was a "reasonable compromise." The Commission approved restrictions on allowable bank withdrawals. The Commission ordered Peoples to restrict transportation customers peak day withdrawals from allowable banks to 60% of a customer's maximum daily demand.

Peoples, Producer-Marketers and Intervenors appeal particular aspects of the Commission's order. Section 10—201(a) of the Act provides that any person affected by a final order or decision of the Commission may appeal to the appellate court "for the purpose of having the reasonableness or lawfulness of the rule, regulation, order or decision inquired into and determined." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(a).) On appeal, the Commission's findings of fact shall be held *prima facie* to be true and the decision of the Commission shall be held to be *prima facie* reasonable. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(d).) The party appealing a Commission's decision has the burden of proving all issues raised. (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(d).) Section 10—201(e)(iv)(A) of the Act states that a reviewing court must reverse a Commission's order or decision in whole or in part, if it finds that

> "[t]he findings of the Commission are not supported by substantial evidence based on the entire record of evidence presented to or before the Commission for and against such rule, regulation, order or decision." (Ill. Rev. Stat. 1987, ch. 111²/₃, par. 10—201(e)(iv)(A).)

In *Metro Utility v. Illinois Commerce Comm'n* (1990), 193 Ill. App. 3d 178, 549 N.E.2d 1327, the court defined "substantial evidence" as " '[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion and consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.' " *Metro Utility*, 193 Ill. App. 3d at 184, 549 N.E.2d at 1330-31, quoting Black's Law Dictionary 1281 (5th ed. 1979).

This appeal raises 10 issues by the various parties. This opinion will first address the Intervenors' two issues of whether the (1) Commission may refuse to consider the results of a Commission-ordered audit of a utility company's management practices when setting just and reasonable rates for that company, and (2) whether the Commission's determination that Peoples was entitled to a return on common equity of 13.25% was supported by substantial evidence. Secondly, the opinion will address Peoples' four issues. Peoples appeals whether the

following Commission findings are supported by substantial evidence: (1) deduction of budget plan balances from rate base; (2) disallowance of labor expenses associated with an excess number of positions; (3) disallowance of postage expenses attributable to the 1991 postal rate increase; and (4) no restrictions on the level of standby service that essential services customers may select. Lastly, the opinion will address the Producer-Marketers' issues of whether the following Commission findings are supported by substantial evidence: (1) the imposition of interim standby demand and standby entitlement charges; (2) the application of a 50% multiplier to the interim standby demand and entitlement charge; (3) the restriction of transportation customers' peak day withdrawals from allowable banks to 60% of a customer's maximum daily allowance; and (4) the imposition of administrative charges upon each transportation account.

## INTERVENORS' ISSUES

First, Intervenors contend that the Commission's order should be reversed because the Commission did not consider the results of Metzler's audit. In the Commission's order, it stated:

"On March 13, 1990, an Emergency Motion to require Metzler and the Commission Staff to put into the record of this proceeding the entire management audit report and the most recent Staff Assessment Report was served by the Intervenors. That motion was denied by the Hearing Examiner on April 2, 1990. Prior to the third and final evidentiary phase of the proceeding, on July 16, 1990, an Application for Subpoena was served by the same Intervenors. The Application asked that the Commission issue a subpoena compelling the presence of a Metzler employee to testify on the subject of the management audit of Respondent conducted by Metzler, pursuant to the Commission's order in Docket 87—0232. That Application was denied by the Hearing Examiner on July 26, 1990.

On August 1, 1990, the Intervenors served a Petition for Interlocutory Review of the Hearing Examiner's Denial of Application for Subpoena (the 'Petition'). The Hearing Examiner recommended denial of the Petition, stating:

Under The Public Utilities Act, specifically, Section 8—102, the Commission has authority to order management audits of public utilities. The Act does not specifically or indirectly contemplate the use of management audit reports in rate cases nor has the Commission, in any order ever indicated that it contemplated such use in a traditional rate case. The evidence which is

sought is outside the scope of this proceeding which is using a forecasted test year of 1991. The management audit recommendations relate to People's operations for a four year period prior to the test year of this case and generally have no relevance to issues in the rate case. However, the original ruling did not preclude the introduction of audit study recommendations that are relevant and applicable to rate case adjustments and such testimony has been made of record. The Intervenor's application ignores this, and Intervenors have consistently misrepresented the Examiner's ruling and the record evidence in this proceeding."

In the proceeding below, Peoples had six witnesses whose testimony concerned Metzler's audit. The Commission's staff had three witnesses regarding the audit, including testimony on the use of the audit in preparing testimony for the lower proceeding. The Intervenors had two witnesses on the subject. One witness, Mr. Sommer, testified exclusively about Metzler's audit and proposed only one adjustment to operating income based upon that audit which the Commission rejected as meritless. Contrary to the Intervenors' argument, relevant evidence from Metzler's audit was introduced into evidence.

The Intervenors also argue that the Act and the Commission's order of Metzler's audit indicate that management audits are to be used in rate cases. The only support the Intervenors offered for this argument is general language relating to just and reasonable rates. The Commission correctly rejected this argument. The Commission does have the authority to order management audits of public utilities under section 8—102 of the Act. (Ill. Rev. Stat. 1989, ch. 111⅔, par. 8—102.) This section of the Act does not specifically or indirectly contemplate the use of management audit reports in rate cases nor did the Commission indicate when ordering the audit that it be used in a traditional rate case.

If the General Assembly had intended a section 8—102 audit to be used in traditional rate cases, such an intent could have been easily accomplished. For example, section 9—213 of the Act, relating to construction audits, clearly states that such audits are to be used in rate cases. Ill. Rev. Stat. 1989, ch. 111⅔, par. 9—213.

■ One of the legislative changes made in 1986 to the Act was full adoption of the Illinois Administrative Procedures Act (Ill. Rev. Stat. 1989, ch. 127, par. 1001 *et seq.*). (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—101.) Section 10—101 of the Act further declares that ratemaking cases are contested cases. Section 12 of the Administrative

Procedures Act provides that in a contested case: "[i]rrelevant, immaterial or unduly repetitious evidence shall be excluded. The rules of evidence and privilege as applied in civil cases in the Circuit Courts of this State shall be followed." (Ill. Rev. Stat. 1989, ch. 127, par. 1012.) Metzler's audit was taken in 1987. The test year in this case was 1991. The figures in the 1987 audit would not have been updated to reflect the test year. We hold that the Commission reasonably decided that without sworn testimony that some conclusions in Metzler's audit reduce costs, increase revenue or have some similar effect within the rate case test year, the 1987 figures are too remote and, therefore, are immaterial and irrelevant in the case at bar. We find that the Commission was correct in admitting only the relevant evidence from Metzler's audit and the preclusion of the audit as a whole does not render the Commission's order contrary to law.

■ Intervenors' second contention is that the Commission's determination that Peoples should be authorized to earn a return of 13.25% on common equity was not supported by substantial evidence. On October 23, 1992, Intervenors filed a motion to suggest partial mootness. Intervenors admitted that this issue is moot because on October 6, 1992, the Commission entered an order in Illinois Commerce Commission docket No. 91—0586 setting new rates for Peoples. That order supersedes the rates set in the order appealed from in this case. Therefore, we hold that the issue regarding the appropriate rate of return on Peoples' common equity is now moot.

### PEOPLES' ISSUES

■ Peoples' initial argument is that the Commission's deduction of budget plan balances from the rate base must be reversed because the Commission's order is not supported by substantial evidence. We disagree. The Commission deducted $46,211,000 from Peoples' rate base as "customer supplied funds." The $46 million figure is based on the Commission's staff's accountant, Mr. Mroczek's testimony that $16,450,000 of customer deposits and $29,761,000 of customer payments (budget plan balances) should be deducted from the rate base. Pursuant to the Commission's regulations, Peoples offers its customers the opportunity to participate in the plan. Under that plan, customers make levelized payment for 11 months with a settlement payment the twelfth month. Mroczek proposed to deduct almost $29.8 million in budget plan balances from rate base because those balances represent rate payer supplied capital supporting rate base. Mr. Rothschild, Intervenors' witness, also found that budget plan balances are found in rate base and should be subtracted out. It has been held that

a public utility should not earn a return from funds contributed by its customers. *Killarney Water Co. v. Illinois Commerce Comm'n* (1967), 37 Ill. 2d 345, 226 N.E.2d 858; *Du Page Utility Co. v. Illinois Commerce Comm'n* (1971), 47 Ill. 2d 550, 267 N.E.2d 662.

Peoples argues that it offered "compelling" evidence to demonstrate that budget plan balances do not finance rate base. Further, Peoples argues that capitalization exceeds rate base and no deductions should be allowed. Peoples, however, failed to provide a cash working capital analysis to prove that the budget plan balances were not rate based. Moreover, Peoples provided no detailed analysis reconciling rate base with capital structure. We find that the record contains substantial evidence that budget plan balances do finance rate base and, therefore, should be deducted out of the rate base.

Relating to the above issue, Peoples additionally argues that other rate cases allowed the rate basing of budget plan balances (R. Vol. 9 C3657, Commission order 83—0580, at 6), and therefore, it is contrary to law for the Commission in the instant case to deduct those balances from the rate base. The Commission, however, is not subject to *res judicata. (Mississippi River Fuel Corp. v. Illinois Commerce Comm'n* (1953), 1 Ill. 2d 509, 116 N.E.2d 394; *Peoples Gas, Light & Coke Co. v. Illinois Commerce Comm'n* (1988), 175 Ill. App. 3d 39, 529 N.E.2d 671.) Furthermore, an allowance of an item in the past does not mean that item will not later be rejected after investigation. (See *Citizens Utility Co. v. Illinois Commerce Comm'n* (1987), 153 Ill. App. 3d 28, 504 N.E.2d 1367; *City of Chicago v. Illinois Commerce Comm'n* (1985), 133 Ill. App. 3d 435, 478 N.E.2d 1369; *Monarch Gas Co. v. Illinois Commerce Comm'n* (1977), 51 Ill. App. 3d 892, 366 N.E.2d 945.) The Commission's decision is not contrary to the law.

Next, Peoples contends that the Commission's disallowance of labor expenses associated with excess number of positions is unreasonable. The Commission found that the number of employees in the test year was overstated by 118 positions. The number 118 is an average annual number based upon a 26-month study done by the Commission's staff. The Commission rejected the calculations of the cost savings per position, reduction of projected wages and benefits in the test year, that were presented by both the Commission's staff and Peoples. The Commission averaged the Commission's staff's calculation of the cost savings with Peoples' calculation, as adjusted to include a benefits factor.

■ The Commission's finding that the Commission's staff's calculation is unreasonably high is supported by the evidence. The $51,557 Commission's staff figure is an average usage and benefit for all Peo-

ples' employees. Peoples' study, however, indicates that the 118 vacancies are most likely to occur in lower-paying, entry-level positions than spread evenly over all position levels. Nonetheless, Peoples' study is not a calculation of the average wages and benefits of the average 118 vacancies.

Peoples' calculation of $13,667 is based on the difference in the number of employees for a single month, September 1989. Using September 1989, about 20% of the vacancies were part-time employees, which is not surprising for September and a company that had 77 summer part-time employees in June 1990. The Commission's criticism of Peoples' study, thus, is that these numbers and types of vacancies are not necessarily representative of any 12-month period or the 26-month period that the Commission's staff's study used. We find that the Commission's decision to average the Commission's staff's calculation of cost savings with Peoples' calculation represents a rational basis for determining the labor cost overstatement of the 118 positions in the test year and, therefore, is reasonable and is supported by sufficiently substantial evidence.

■ Peoples' third contention is that the Commission's disallowance of postage expenses attributable to the 1991 postal rate increase was not supported by substantial evidence. We disagree. The record contains no proof that the increase in postage costs would occur in the test year. Only known or measurable changes are to be included in the budget. (R. Vol. 27, Tab 125, Resp. Ex. P, at 2; Welch, *Conduct of the Utility Rate Case*, Pub. Util. Rep., Inc., at 66 (1985).) Peoples admitted that the only reason the postal expense was adjusted was because Peoples read in a newspaper that postal expenses were to change in the test year, 1991. Peoples' witness admitted that no governmental body had notified it of any proposed or anticipated postal expense change. Since Peoples failed to provide the Commission with any evidence to support its additional postal expense, the Commission's disallowance is supported by substantial evidence.

■ Peoples' final contention is that the Commission's finding that there should be no restrictions on the level of standby service that essential services customers may select should be reversed. Peoples proposed to require essential services customers to have standby service to the extent that such customers lack alternate fuel capability. Prior to the Commission's approval in the instant proceeding of modifications to Peoples' transportation of customer-owned gas program, the program consisted solely of rider 17, which is an alternative to traditional retail gas sales service. This service made it possible to offer transportation as a separate service rather than as a piece of its sales

service. Under rider 17, a customer purchases its own supply of gas and arranges for the transportation of that gas to the Chicago city limits, from which point Peoples transports that gas to the customer. Further, under rider 17, Peoples is obligated to provide standby service to its transportation customers for their full gas requirements. Thus, to the extent that a transportation customer's deliveries of customer-owned gas fall short of its requirements on any day, Peoples is obligated to satisfy the remainder of that customer's requirements from Peoples' system supply.

Peoples proposed a new rider 17A to its schedule of rates that would permit transportation customers to select a level of standby service from Peoples that meets less than their full requirements. Under this proposal, if a transportation customer's deliveries fall short of its requirements on a given day, Peoples would only be obligated to meet that customer's requirements up to the level of selected standby service. Thus, customers taking gas in excess of their selected standby level receive a service for which they have not paid. The Commission reasonably approved a $1-per-therm unauthorized use charge.

Peoples proposed another restriction on access to rider 17A service regarding "essential service customers," such as residences, schools, hospitals and other customers who provide a service for which curtailment or interruption of gas service would have the effect of impairing or interfering with an activity essential to health or safety. Peoples' restriction would require essential service customers to select and purchase standby service at least to the extent to which they lack alternative fuel capability. Essential service customers, therefore, are not prohibited from selecting less than full standby service, but in order to do so must possess alternate fuel capability sufficient to meet the level of their requirements for which they do not select standby service. Peoples' rationale for this restriction is that the essential service customers would not be deterred by the $1-per-therm penalty for using Peoples' system gas above their contracted-for level of standby. The Commission rejected the proposed restriction on the essential service customers.

Peoples offered no evidence as to the number of transportation customers which are to be classified as essential services customers, except an unsubstantiated statement that more than 50% of its transportation customers are essential transportation customers. Further, there was no evidence as to which essential services customers lacked installed alternate fuel capacity. Moreover, Peoples admitted that it made no studies to support its disparate treatment of different types

of transportation customers. Additionally, there is no evidence that, regarding essential service customers, penalties for using Peoples' gas above the selected level of standby is an insufficient enforcing tool. Essentially, Peoples requested that the Commission place a restriction on an unknown number of transportation customers, who have an unknown impact on the amount of standby gas Peoples must obtain, based on Peoples' "belief" that essential services customers will exceed their standby gas levels irrespective of penalties. The record is devoid of any evidence that would support a restriction of rider 17A on essential services customers. Thus, we find that the Commission's decision that no restriction on the level of standby service that essential services customers may select should not be reversed.

### PRODUCER-MARKETERS' ISSUES

■ The Producer-Marketers contend that the Commission erred in granting the imposition of interim standby demand and standby entitlement charges. The Commission allowed Peoples to charge transportation customers for certain of Peoples' fixed costs for providing standby service. The standby demand charge and the standby entitlement charge are subject to further examination and potential adjustments. There will be testing and reevaluation of these charges in the transportation rate design.

Producer-Marketers argue that Peoples incurs no costs in reserving gas for use as standby gas for transportation customers. This argument is meritless. Initially, we must note that Peoples is required under rider 17 to supply 100% standby gas services and the customer-selected amount of standby under present rider 17A. There is a cost for reserving this gas. Since the gas is reserved for the benefit of transportation customers, those customers should bear the costs.

Relying on *People ex. rel. Hartigan v. Illinois Commerce Comm'n* (1987), 117 Ill. 2d 120, 510 N.E.2d 865, Producer-Marketers further argue that without the proof of actual usage of standby gas, the standby demand and entitlement charges should have been denied in their entirety by the Commission. In *Hartigan*, the supreme court rejected a decision by the Commission because it found that the utility was responsible for delays, and therefore, the utility was responsible for a portion of the cost incurred in building the power plant. (*Hartigan*, 117 Ill. 2d at 145, 510 N.E.2d at 869-70.) In the case at bar, Peoples is not a causation, nor part of the causation, of incurring expenses for reserving gas for transportation customers. *Hartigan*, thus, is distinguishable because in that case, the supreme court would not allow the Commission to pass on a cost to consumers which the

utility actually caused, and in the instant case, the utility is not causing the expense to be incurred.

Transportation customers had been receiving a benefit by having standby service available cost-free. A recipient of such a benefit cannot complain if such a benefit is discontinued. (*Antioch Milling Co. v. Public Service Co.* (1954), 4 Ill. 2d 200, 123 N.E.2d 302.) The Commission's decision to allow for interim charges for standby demand and entitlement charges is supported by substantial evidence.

■ Producer-Marketers' next argument is that the Commission's decision to apply a 50% multiplier to the interim standby demand charge and to the interim standby entitlement charge is erroneous. Producer-Marketers argues that the resources which form the basis for its standby charges are not used and the standby charges, therefore, should not be included in rate base. This argument is waived. Under section 10—113 (Ill. Rev. Stat. 1989, ch. 111⅔, par. 10—113), a party may not raise on review an issue or objection that was not expressly raised in the required application for rehearing. (See also *Citizens Utilities Co. v. Illinois Commerce Comm'n* (1988), 124 Ill. 2d 195, 529 N.E.2d 510.) Since Producer-Marketers failed to object to the resources used to determine standby charges in its petition for rehearing, the issue is waived.

■ Producer-Marketers' third issue is that the Commission erred in deciding to restrict transportation customers peak day withdrawals from allowable banks to 60% of a customer's maximum daily demand because there was no evidence to support such a restriction. The expert testimony varied. Commission's staff testified for a 46.7% restriction. Peoples testified that the proper restriction would be 40.9%. Rosenberg suggested a 75% restriction. Lastly, Bamberger disagreed with allowing any such restriction and, thus, testified for an allowable 100% withdrawal. In its brief, Commission's staff argued that given the various uncertainties, the withdrawal restriction should be above 46.7%, ultimately suggesting 60%.

The Commission does not need to wait for there to be a gas shortage on a peak day before establishing reasonable restrictions. (*Municipality of Princeton v. Illinois Commerce Comm'n* (1974), 17 Ill. App. 3d 812, 308 N.E.2d 625.) Any disadvantage to transportation customers on a peak day arises out of their method of doing business. (See *Antioch Milling Co.*, 4 Ill. 2d 200, 123 N.E.2d 302.) The withdrawal restriction is a balancing of interests between classes of customers for which the Commission was created. (*Institute of Shortening & Edible Oils, Inc. v. Illinois Commerce Comm'n* (1977), 45 Ill. App. 3d 98, 100-01, 359 N.E.2d 231, 233.) Accordingly, we find that

there is substantial evidence to support the above restriction and the 60% restriction on peak day withdrawals.

■■ Finally, Producer-Marketers disagree with the Commission's allowance for Peoples to recover an administrative charge which represents the incremental administrative and meter reading costs for servicing transportation accounts. The only evidence regarding the above charge is a study done by Peoples justifying the charge and the Commission's staff review of the reasonableness of the evidence. There is nothing in the record which suggests that an administrative charge to cover the annual costs of reading hundreds of meters throughout Chicago is unreasonable. We, therefore, hold that the Commission's decision to impose an administrative charge on each transportation account is supported by substantial evidence.

In summary, we found the issue concerning return on common equity to be moot and uphold the Commission's rulings and findings on the remaining nine issues. Thus, the order of the Illinois Commerce Commission is affirmed.

Affirmed.

MANNING, P.J., and CAMPBELL, J., concur.